## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Dec 22, 2011

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JEFFRY DUNCAN, | ) | Case No. 10-11859-M |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| RANDY MOSES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFRY DUNCAN, | ) | Adv.  No. 10-01096-R |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the Court is the Complaint of Plaintiff Randy Moses ("Moses") in which he seeks a determination that certain debts of Defendant Jeffry Duncan ("Duncan") are excepted from discharge under Sections 523(a)(2), (a)(4), and/or (a)(6) of the Bankruptcy Code.  A trial on the merits was held on May 19-20, 2011.  Moses appeared in person and by and through his counsel, Tracy A. Cinocca.  Duncan appeared in person and by and through his counsel, Anthony Seeberger ("Attorney Seeberger").

After carefully considering the pleadings filed in this adversary proceeding and in Duncan's main bankruptcy case, the testimony elicited and exhibits admitted at trial, the legal arguments of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law.

I.       **Jurisdiction**

The Court has jurisdiction of this core proceeding by virtue of 28 U.S.C. §§ 1334, 157(a) and 157(b)(2)(I), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

II.      **Findings of Fact**

Moses claims that Duncan and Michael Seeberger ("Seeberger")[1] are liable to him for damages based upon their conduct after a limited liability company they jointly owned, Oklahoma Casing Crews LLC (the "First OCC"), ceased doing business. Moses, Duncan, Seeberger, and John Barnes ("Barnes") each owned a twenty-five percent interest in the First OCC.

Duncan and Seeberger filed voluntary petitions under Chapter 7 of the Bankruptcy Code on June 3, 2010. Moses, acting *pro se*, filed separate but identical adversary complaints against Duncan and Seeberger. Interpreting his complaint generously, it appears that Moses seeks a declaration that the alleged damages are excepted from discharge under 11 U.S.C. § 523(a)(2), (a)(4) and/or (a)(6).

In his complaint, Moses alleged, without any supporting factual allegations, the following: "Fraudulent transfer of property for personal gain" and "[f]alse representation," which the Court allowed to proceed to trial as a claim under § 523(a)(2);[2] "[w]illful and malicious injury to plaintiff," which was allowed to proceed as a § 523(a)(6) claim; "[f]raud

_____

[1]Seeberger is the defendant in the adversary proceeding styled <u>Randy Moses v. Michael Seeberger</u>, Adv. No. 10-1095-R. The two adversary proceedings were administrative consolidated for the purposes of scheduling and trial.

[2]Unless otherwise stated, all statutory references in the text refer to the Bankruptcy Code, Title 11 of the United States Code.

as fiduciary, embezzlement and larceny of [j]oint [p]roperty," which was allowed to proceed

as a § 523(a)(4) claim; and "Declaratory Judgment [a]gainst Defendants in prior lawsuit,"

which the Court interpreted as a request to declare that orders entered in a prior civil lawsuit

establish his claims herein under the doctrine of collateral estoppel.  In addition, Moses

alleged that "Defendants failed to comply and ignored Court Orders [d]uring [l]awsuit in

previous  case  involving  litigants"  and  "[w]ere  charged  w[ith]  Contempt  of  Court  in

[p]revious  [c]ase  ([p]ending)," and  seeks  non-dischargeable  damages  therefor  under

§ 523(a)(6).[3]

     After weighing all the evidence and considering the credibility of the witnesses, the

Court makes the following findings of fact.[4]

     A.    The First OCC

     In 2004, Moses, Duncan, and Seeberger worked together for a third-party oil field

services company.  In November 2004, the three men decided to form and own a business

entity specializing in the installation of oil well casing.  In anticipation of the venture, Moses

individually purchased and took title to a truck and certain heavy equipment that the

company would need for casing wells, investing approximately $90,000 to $100,000 in those

assets.  In December 2004, the three men approached Seeberger's friend, Barnes,  about

---

     [3]While this Court normally requires the entry of a pre-trial order to frame the factual
and legal issues to be tried, the parties failed to submit a  workable proposed pre-trial
order–the order submitted by the parties interspersed argument with stipulations and issues
to be tried.  Accordingly, in the absence of a pre-trial order, the complaint governed the
proceeding.  The Court invited counsel to present the arguments contained in the proposed
pre-trial order in trial briefs, but no trial briefs were filed.

     [4]This section contains certain conclusions of law as necessary to establish the legal
consequences of certain events in order to put later events into context.

joining them in the venture.  On December 27, 2004, Barnes filed Articles of Organization

with the Oklahoma Secretary of State to form the First OCC,[5] and the Secretary of State

issued a Certificate of Limited Liability Company for the First OCC on the same date.[6]

On February 3, 2005, Moses, Duncan, Seeberger, and Barnes executed an Operating

Agreement.  The entire agreement is as follows–

> Be it known that Jeff Duncan, John Barnes, Randy Moses and Michael
> Seeberger have agreed to form a [sic] Oklahoma Limited Liability Company
> for profit, namely Oklahoma Casing Crews LLC.  The operation of the LLC
> shall be governed by the terms of this agreement and the provisions of the
> Oklahoma Limited Liability Company Act.  The parties intend that the LLC
> shall be taxed as a partnership.

> Each member is granted 25% ownership in the Company and agrees to
> share in the profit and liability of the above named Company.[7]

The First OCC began business activities in approximately March 2005.  The members

assumed certain roles concerning the operation of the company.  Duncan and Seeberger

worked in the field installing casing on oilfield sites.  Moses supplied his truck and

equipment to the enterprise under a lease agreement, maintained the equipment, obtained

casing jobs, and worked in the field.  Moses also had a rig company, Red River, that

employed the First OCC to perform casing jobs on its rigs.  Barnes maintained the company's

books and records, and oversaw the banking, payroll, distribution, accounting, insurance,

marketing, contracting, invoicing and collection functions, and also worked in the field.  The

---

[5]Defendant's Exhibit 1.

[6]Defendant's Exhibit 2.

[7]Defendant's Exhibit 4.

members never formally appointed any one of them to act as "manager"; therefore, under Oklahoma law, all four members were considered "managers" of the First OCC.[8]

The First OCC opened a bank account at First United Bank on which Duncan, Moses, and Barnes had signatory authority. Barnes, acting as treasurer and office manager, kept the checks and account statements in an office at his home. Barnes had exclusive control of the financial affairs of the First OCC, and he alone determined when distributions were made to the members. Generally, when funds were available, he would make equal distributions to each of the members. At first, each member received distributions in the amount of $2,000, and as business improved, their distributions increased to $5,000.

Over the course of 2005-06, the First OCC purchased and took title to a 2005 Ford 6500 (sometimes referred to by the parties as the F-650 or the "Big Truck"), surface tongs, a specialized truck bed, elevators, a set of power tongs, and other equipment.[9] The First OCC also purchased a Chevy Silverado one-ton truck, which was titled in the name of Moses dba Oklahoma Casing Crews.

The business of the First OCC was successful. In 2005, its first year of operation, it recorded gross receipts of $285,473[10] and in 2006, gross receipts rose to $642,050.[11]

---

[8]See 18 O.S. 2001, § 2015.

[9] See 2005 U.S. Return of Partnership Income for Oklahoma Casing Crews LLC, at Form 4562 (Depreciation and Amortization) and 2006 U.S. Return of Partnership Income for Oklahoma Casing Crews LLC, at Form 4562 (Depreciation and Amortization), Plaintiff's Exhibits 34 and 35.

[10]See 2005 U.S. Return of Partnership Income for Oklahoma Casing Crews LLC, at Form 1065, Plaintiff's Exhibit 35.

[11]See 2006 U.S. Return of Partnership Income for Oklahoma Casing Crews LLC, at Form 1065, Plaintiff's Exhibit 34.

However, the relationships between and among the members deteriorated in 2007.  When its customer Red River went out of business in 2007, the First OCC's revenues declined by approximately 45%. The First OCC ceased doing business in October 2007.

The company did not conduct business meetings, and Barnes did not distribute any monthly or annual financial reports to the members.  Duncan and Seeberger lacked the means of determining the financial status of the company or whether Barnes had accurately accounted for receipts, expenses, and distributions of the First OCC.[12]

In 2007, Barnes failed to timely file the First OCC's annual statement of continuation of business with the Secretary of State, as required by Oklahoma law, and therefore the First OCC ceased to be in good standing as of September 1, 2007.[13]

B.    The Lease Agreements

On or about February 19, 2005, the First OCC entered into a Lease Agreement with Moses (the "2005 Lease Agreement"), wherein the company agreed to lease the truck and equipment Moses had purchased in anticipation of commencing the business ("Moses's Truck and Equipment") at the rate of $5,000 per month for a term of one year.[14]  Under the

---

[12]Plaintiff's Exhibit 44, Transcript of Deposition of Michael Seeberger taken on July 23, 2009, in connection with litigation initiated by Moses and Barnes in Creek County, Oklahoma ("Seeberger Tr."), at 68.

[13]See 18 O.S. 2006 § 2055.2(D) (a limited liability company ceases to be in good standing 60 days after it fails to file the annual certificate confirming that it is an active business).  The due date for filing such certificates was July 1 in 2005 and 2006.  See 18 O.S. 2001 § 2055.2(B).  In 2006, § 2055.2(B) was amended to require the certificate to be filed on or before "the anniversary date" of the last certificate.  Accordingly, in 2007, the First OCC was required to file its annual certificate on or before July 1, 2007.  When it failed to do so within the 60 days following the July 1, 2007, due date, it lost recognition as a continuing business entity by the Oklahoma Secretary of State.

[14]Lease Agreement, Plaintiff's Exhibit 2

2005 Lease Agreement, payments on the lease were to be deferred for six months, until August 19, 2005, at which time $30,000 would be due; thereafter, the company was to make monthly payments of $5,000 for the remaining term of the lease.  Moses signed the 2005 Lease Agreement in his individual capacity on behalf of the Lessor.  Duncan, Seeberger, and Barnes signed the 2005 Lease Agreement in their capacities as "officers" of the First OCC. The 2005 Lease Agreement expired on February 18, 2006.

On or about February 19, 2006, Barnes drafted a second one year lease agreement (the "2006 Lease Agreement") which provided that the First OCC would continue paying Moses $5,000 per month to lease Moses's Truck and Equipment for another year.  Only Moses and Barnes signed the 2006 Lease Agreement, and thus its validity as a binding obligation of the First OCC is questionable, but the validity need not be resolved herein.

Notwithstanding that the 2005 and 2006 Lease Agreements arguably obligated the First OCC to pay Moses $5,000 per month for a period of two years, the company paid approximately $37,000 in lease payments to Moses in 2005, and did not make any lease payments in 2006.  Barnes (who had exclusive control of the First OCC's funds) and Moses agreed that the company would defer lease payments until some unspecified later date in order to insure that the company had sufficient operating funds.  Duncan and Seeberger were not involved in discussions about deferring the lease payments, and there was no evidence that they knew that Moses was *not* receiving lease payments on a monthly basis.  Although Duncan and Seeberger later opposed the lease of Moses's Truck and Equipment, neither of them caused the First OCC to withhold lease payments from Moses.

7

C.    Termination of Business of the First OCC

Although the First OCC enjoyed financial success, rifts and distrust among the members undermined its continued viability.  Barnes complained about Seeberger's work performance.  Seeberger and Duncan believed Moses was overcompensated for the company's use of Moses's Truck and Equipment.  Seeberger and some employees objected to the employment of Moses's girlfriend in the field.  In July 2007, Barnes took $45,000 of the company's money and divided it between himself, Seeberger, and Duncan, to the exclusion of Moses.[15]

Thereafter, an employee of the company started a rumor (that was never substantiated) that Barnes had stolen funds from the First OCC, prompting Seeberger to demand that Barnes produce a written financial statement accounting for the company's earnings, expenditures, and distributions.  Barnes refused.[16]  Seeberger then asked Barnes directly if he was stealing company funds, which angered Barnes.[17]

---

[15]Barnes did not cash his $15,000 check.  Barnes testified that he made the $45,000 distribution in order to placate Duncan and Seeberger.  Seeberger testified that Barnes made the distribution because Barnes was afraid that Moses would "wipe out the account."  Trial Testimony of Barnes. Thereafter, Barnes did not make any further distributions to Duncan and Seeberger, although he made several additional distributions to himself and Moses.  See Hinkle Report, Plaintiff's Exhibit 41 (excel spreadsheet, page 1).

After all distributions were reconciled, however, it was established that distributions made to Moses exceeded those made to Barnes and Seeberger, and equaled distributions made to Duncan.  See Hinkle Report, Plaintiff's Exhibit 74, at 470 (showing that Moses received $16,795 in excess distributions).

[16]Seeberger Tr. at 68.

[17]Seeberger Tr. at 151, 153.

On October 28, 2007, Barnes called the members of one of the company's crews to do a job for one of the First OCC's regular customers. The employees refused to do the job unless certain conditions were met. Barnes called the customer back and told him "we're out of business; you need to call [competitor] Dan Darling." Barnes concluded that "there was nothing but hate and discontent," and "they were going under."[18] Without a meeting or a vote of the members, he "shut down" the First OCC "because he no longer wanted to be a part of this business."[19] Barnes immediately cancelled the First OCC's insurance policies on all the vehicles and equipment, including Moses's Truck and Equipment.[20] Dan Darling called Moses and asked him to schedule a meeting with all four members so that he could make an offer to buy all the hard assets of the First OCC, as well as Moses's Truck and Equipment.

Two days later, Moses sold Moses's Truck and Equipment to Dan Darling for $65,000, in part because Barnes had cancelled the insurance policies. Moses and Dan Darling then went to Duncan's residence where the some of First OCC's vehicles and equipment were located. Barnes and Seeberger were also present at Duncan's residence. Prior to Dan Darling's arrival, Seeberger was not aware that Barnes and Moses intended to sell the First OCC's assets to Dan Darling. Dan Darling made an offer[21] for the Ford 6500,

---

[18]Trial Testimony of Barnes.

[19]Trial Testimony of Moses.

[20]Id.

[21]Barnes testified that Dan Darling offered $200,000 for the assets. Moses testified that the offer was $125,000. Seeberger testified that he did not know a definite offer was made, but he was opposed to selling the equipment without any notice, and before Barnes had given an accounting of the First OCC's financial status. Duncan understood that Dan

power tongs, long string tongs, and various sets of pipe elevators, pipe slips, and tools (the "Big Truck and Equipment"), as well as other tools and pieces of large equipment owned by the First OCC that were stored at Moses's home.[22]  Moses and Barnes wanted to sell the assets, but Duncan and Seeberger did not.  Lacking a majority vote to sell, Dan Darling's offer was declined.  The Big Truck and Equipment were left at Duncan's residence.  The other hard assets of the First OCC, including the Chevy Silverado, were left in Moses's possession.

At the time the First OCC ceased doing business, its only outstanding obligation, other than a few ordinary-course debts which Barnes promptly paid from the First OCC's account, was the obligation to Moses for the unpaid lease installments.  Thereafter, Barnes collected approximately $100,000 for jobs performed by the First OCC prior to terminating operations, which he deposited in the First OCC's bank account.  Barnes did not use the funds to maintain insurance coverage on the First OCC's assets, or to pay the First OCC's lease obligation to Moses, however.  Instead, Barnes apparently devoted virtually all of the First OCC's cash to payment of legal fees incurred by Barnes and Moses.  Neither Duncan nor Seeberger agreed that the funds should be used to pay legal fees.

After storing the Big Truck and Equipment in his yard for several months, Duncan moved it to a locked storage yard owned by Doyle Matthews, which at that time was being

---

Darling wanted to buy the assets and that he may have made an offer, but Duncan did not remember knowing the terms of the offer.

[22]The Chevy Silverado located at Moses's residence was excluded from the offer, however.

leased by Indian Territory Well Containment.[23]  At first, Duncan kept the Big Truck and Equipment in the shop to keep it out of the weather, but later the lessee needed the use of the shop, so Duncan moved the Big Truck and Equipment outside.  While the truck was there, Duncan took the smaller set of tongs off the truck and put them in the shop, where he planned to paint them.  Duncan periodically started the truck for maintenance purposes; when it finally failed to start, he took the batteries to his home to charge, but they would not take a charge so he never put them back in the truck.

None of the members of the First OCC ever sought, obtained, or relied upon advice of an attorney in connection with the formation, operation, or cessation of doing business. Although Barnes had some business experience, Seeberger and Duncan were not sophisticated businessmen.  They relied primarily on Barnes to manage the legal and financial affairs of the company.  As noted above, at the time the First OCC ceased doing business, the Secretary of State no longer recognized the First OCC as a continuing limited liability company,[24] and consequently it had forfeited the protection of its name and its right to sue.[25]

After Barnes "shut down" the company, Duncan and Seeberger again asked Barnes for financial records, which were not provided.  Duncan's wife requested that Barnes turn

---

[23]Duncan was employed by Indian Territory Well Containment at that time.

[24]Seeberger Tr. at 33-34; Plaintiff's Exhibit 43, Transcript of Deposition of Jeffry Duncan taken on July 23, 2009, in connection with litigation initiated by Moses and Barnes in Creek County, Oklahoma ("Duncan Tr.") at 38; Trial Testimony of Barnes.

[25]If a limited liability company is not in "good standing," it and its successors and assignees are prohibited from "maintain[ing] any action, suit or proceeding in any court in this state."  18 O.S. 2006, ¶ 2055.2(G)

over the company's computer, but Barnes refused.  Because Barnes had consistently resisted requests to provide financial records, Seeberger and Duncan remained suspicious of Barnes's handling of the company's funds.  Duncan eventually obtained copies of the company's bank statements directly from the bank.[26]  In December 2007, Duncan sent letters to customers of the First OCC requesting copies of records establishing every payment made to the First OCC, so that they could be compared with bank deposits to determine whether any payments had been diverted from the company's account.  The letters, which were authored by Duncan's wife, advised customers that an audit was needed due to "embezzlement."

Seeberger and Duncan hired an accountant, Ralph Osborn, to perform an audit and an accounting of the First OCC.[27]  Mr. Osborn did not obtain all the documents he requested from Barnes in a timely manner, and he never completed the audit.

D.    The Second OCC and D and S Casing

After Barnes "shut down" the First OCC, the now-unemployed Seeberger decided to form a new entity to provide casing services.  Seeberger learned from the office of the Secretary of State that the name Oklahoma Casing Crews LLC was available.[28]  He "bought" the name, executed articles of organization, and obtained a new and distinct Federal Employer Identification Number ("FEIN").[29]  On November 20, 2007, the Secretary of State

---

[26]Seeberger Tr. at 180.

[27]Seeberger Tr. at 86-87.

[28]Seeberger Tr. at 12.

[29]Seeberger Tr. at 12.

issued a Certificate of Limited Liability Company to evidence Seeberger's filing of Articles of Organization for Oklahoma Casing Crews LLC (the "Second OCC").[30]

Seeberger did not discuss the formation of the Second OCC with Barnes or Moses.[31] He believed that because the Secretary of State allowed him to organize an entity under the name Oklahoma Casing Crews LLC, there was nothing wrong with using the name to form the new entity.[32]  He did not reinstate the First OCC by filing an annual certificate and paying a fee because it was clear to him that the First OCC had ceased doing business and would never again do business.[33]  Seeberger did not intend or envision that the Second OCC would compete with the First OCC, and in fact it did not compete with it because in October 2007, when Barnes declared the First OCC terminated, the First OCC ceased doing any casing work.  Nor did he intend to continue the business of the First OCC to the exclusion of Moses and Barnes, as they both made it clear that neither wanted to continue the business with Seeberger as a member.  Seeberger created the Second OCC as a separate and independent entity with no relationship to the First OCC so that he could continue working and earning a living.[34]

---

[30]Articles of Organization, Plaintiff's Exhibit 7; Certificate, Plaintiff's Exhibit 8.

[31]Seeberger Tr. at 32.

[32]Seeberger Tr. at 33-34.

[33]Seeberger Tr. at 35.

[34]Seeberger Tr. at 29.

On May 8, 2008, Seeberger and Duncan entered into a "Partnership Agreement" establishing that each of them owned 50% of the Second OCC.[35]  Neither Seeberger nor Duncan obtained any legal advice concerning the formation of the Second OCC.[36]

The Second OCC obtained its first casing job in the summer of 2008, more than seven months after the First OCC ceased doing business.[37]  There is no evidence that the Second OCC serviced any client of the First OCC.  Nor did the Second OCC use the Big Truck and Equipment owned by the First OCC.[38]  The Second OCC opened a checking account, and none of the funds of the First OCC were available to or used by the Second OCC.[39]

Seeberger invested approximately $20,000 in the Second OCC, and the Second OCC obtained a $50,000 loan.  Duncan and Seeberger each personally guaranteed the loan, and Seeberger's parents pledged certificates of deposit as collateral.[40]  With those funds, the Second OCC purchased a 2008 Ford one-ton truck and equipment essential for installing casing.  Specifically, the Second OCC purchased a set of tongs with a hydraulic lift and

---

[35]See Defendant's Exhibit 8.

[36]Seeberger Tr. at 56-57

[37]Seeberger Tr. at 182.

[38]Seeberger Tr. at 85.  The Big Truck and Equipment remained in Doyle Matthews' locked storage yard until Moses seized those assets in 2009.  Duncan testified that they may have used a set of the First OCC's elevators on a job for the Second OCC, but was not sure.

[39]Barnes and Moses retained control over those funds.

[40]Duncan Tr. at 54-55.  Although Moses complained that Duncan and Seeberger exposed him to liability by obtaining the loan under the name of Oklahoma Casing Crews LLC, he presented no legal theory under which he, Barnes, or the First OCC could have been held liable on a loan obtained by the Second OCC.

various other pieces of equipment from D&D Tongs for $22,723.54;[41] slips and inserts from

Rig Tool Products for $5,824.38;[42] and other equipment from Aberdeen Dynamics for

$6,720.37.[43]  The Second OCC also used a set of elevators borrowed from a third party.

Duncan and Seeberger installed the new equipment on the Second OCC's 2008 Ford one-ton

truck.

On July 21, 2008, after learning that Moses and Barnes objected to the use of the

name Oklahoma Casing Crews LLC, Seeberger filed Articles of Organization to form

another entity, D and S Casing LLC ("D and S Casing").[44]  Duncan and Seeberger continued

the casing business under that name, although for a period of time, they continued to use

funds in the Second OCC's checking account to purchase equipment and pay bills.  The bank

permitted D and S Casing to assume the Second OCC's liability on the equipment loan.

The Second OCC lost its "good standing" status with the Secretary of State on

September 1, 2009, due to the failure to file an annual certificate.[45]

E.    The State Court Litigation

In January 2008, Barnes retained Ms. Cinocca to represent him concerning Mr.

Osborn's request for documents for the audit.  Ms. Cinocca advised Mr. Osborn by letter

dated January 30, 2008, that she had been retained "to represent Mr. Barnes and Oklahoma

---

[41]Invoice, Defendant's Exhibit 26.

[42]Invoice, Defendant's Exhibit 27.

[43]Invoice, Defendant's Exhibit 28.

[44]Articles of Organization for D and S Casing LLC, Defendant's Exhibit 9.

[45]See Certificate, Plaintiff's Exhibit 11.

Casing Crews, L.L.C. as to the resolution of any disputes between the partners," and offered to help assist "drafting separation agreements" and "corporate documents" and in supplying documents to Mr. Osborn for an accounting.[46]  A week later, Ms. Cinocca again advised Mr. Osborn by letter than she had been retained by Barnes to dissolve the First OCC, stating that she would "like to offer you and officers and owners our assistance in dissolving this LLC" and in collecting outstanding receivables.[47]  Seeberger and Duncan were not consulted about and did not consent to the retention of Ms. Cinocca as counsel for the First OCC.  Nor did Ms. Cinocca contact Duncan or Seeberger directly about winding up and dissolving the entity.  Her correspondence was addressed solely to Mr. Osborn.

In response to Ms. Cinocca's offer to assist with the audit, on February 12, 2008, Mr. Osborn sent Ms. Cinocca a list of transactions for which he needed supporting documentation.[48]  Mr. Osborn had previously requested these documents from Barnes and had not received them.  In March 2008, Seeberger and Duncan retained Attorney Seeberger to assist in obtaining documents for the audit and in dissolving and winding up the First OCC.  On March 14, 2008, in a letter to Ms. Cinocca, Attorney Seeberger demanded the requested documents.[49]  When Barnes finally turned over documents some time in April

---

[46]See Letter from Cinocca to Osborn dated January 30, 2008, Plaintiff's Exhibit 16.

[47]See Letter from Cinocca to Osborn dated February 5, 2008, Plaintiff's Exhibit 17.

[48]See Letter from Osborn to Cinocca dated February 12, 2008, Plaintiff's Exhibit 18.

[49]See Letter from Attorney Seeberger to Cinocca dated March 14, 2008, Plaintiff's Exhibit 19.

2008, Mr. Osborn was preoccupied with other engagements and advised that he could not resume working on the audit until July 2008.[50]

In May 2008, Barnes and Moses observed that the Big Truck and Equipment they had left at Duncan's residence in October 2007 was no longer there.  Moses did not call Duncan to inquire about the status or location of the assets.  Instead, on May 28, 2008, Moses and Barnes, individually and on behalf of the First OCC, entered into a fee agreement with Ms. Cinocca to pursue litigation against Duncan and Seeberger.[51]  On June 3, 2008, Ms. Cinocca wrote a letter directly to Duncan and Seeberger (although having been previously advised that they were represented by Attorney Seeberger) advising them that "we have reason to believe several items of equipment are missing that belong to Oklahoma Casing Crews, L.L.C. [a]nd that you have, in all material respects, ceased acting as Members of the company."[52]

---

[50]See Letter from Osborn to Cinocca dated May 19, 2008, Plaintiff's Exhibit 23 ("Due to the delay in your client providing the information that was requested, we are currently completing other audit engagements.  We anticipate returning to this audit in July 2008.")

[51]Engagement Letter dated May 28, 2008, Plaintiff's Exhibit 48.  Duncan and Seeberger did not consent to the retention of Ms. Cinocca by the First OCC.  Thus, the use of the First OCC's funds to pay Ms. Cinocca was not authorized by a majority of the members.  See 18 O.S. § 2018 ("[U]nless otherwise provided in the articles of organization or operating agreement, if the limited liability company has more than one manager, all decisions of the managers shall be made by a majority vote of the managers on a per capita basis.").  Although one manager may bind the company by executing a contract in the ordinary course, if the manager lacks the authority (i.e., because the majority does not consent), and other party has knowledge of the lack of authority, the contract does not bind the company.  See 18 O.S. 2007, § 2019.

[52]Letter from Cinocca to Duncan and Seeberger dated June 3, 2008, Plaintiff's Exhibit 24.  Copies of the letter were sent Moses and Barnes, but not to Attorney Seeberger.

Ms. Cinocca threatened to file suit on behalf of the First OCC against Duncan and Seeberger for "Replevin, Temporary Restraining Order, Injunction and Accounting, Breach of Contract, Right to Equal Distribution, Action on open account, Wrongful Distribution and Accounting, Decree of Dissolution, Designation of Representative for Winding up of Affairs and Breach of Fiduciary Duty," unless they agreed to some unspecified demand.[53]

By that time it was obvious that all the members of the First OCC believed that it should be dissolved and the remaining assets distributed. Duncan and Seeberger were awaiting the completion of the audit, which had been held up by Barnes's delay in providing the requested documentation. After Ms. Cinocca threatened to sue them, however, Duncan and Seeberger filed an action in Creek County, Bristow Division, seeking to wind up and dissolve the First OCC, and to settle up the members' accounts ("Bristow Division Case").[54] Duncan and Seeberger alleged that they "discovered some inconsistencies in the company bank statements such as a payment to a tree removal service for a relative of John Barnes; long distance telephone calls to a penal institution in another state on the company telephone bill; and, a canceled check for the purchase of a vehicle for approximately $32,000.00 paid out of the company bank account for which said truck is titled under the name of Randy Moses, not the company."[55] Duncan and Seeberger also alleged that they were denied access

---

[53]Id.

[54]Petition for Dissolution of Company and for Accounting filed on June 11, 2008, Plaintiff's Exhibit 75.

[55]Id. at ¶ 9.

to business records in violation of the statute incorporated into their operating agreement, and could not complete an audit of the finances of the First OCC.[56]

Before the petition was served on Moses and Barnes, however, Ms. Cinocca filed a petition, amended on July 2, 2008, in Creek County, Sapulpa Division, on behalf of Moses and Barnes, individually, and the First OCC (the "Sapulpa Division Case").[57]  The Amended Petition alleged that the First OCC was in good standing, and requested various remedies in favor of the First OCC, including replevin of the Big Truck and Equipment and a restraining order.[58]  The Amended Petition also sought a winding up, accounting, and dissolution of the First OCC.[59]

---

[56]Id. at ¶¶ 10-14.

[57]Amended Petition, Plaintiff's Exhibit 74, at 28-44.

[58]Because the First OCC was not in "good standing" as of September 1, 2007, it and its successors and assignees were prohibited from "maintain[ing] any action, suit or proceeding in any court in this state." 18 O.S. 2006, ¶ 2055.2(G). There is no evidence that the First OCC was ever restored to the status of "good standing," and the preponderance of the evidence supports the conclusion that it was not. Under Oklahoma law, the articles of a limited liability company are deemed cancelled if the company fails to file its annual certificate and pay the annual fee within three years of the date the fee was due. See 18 O.S. 2010, § 2012.1(B). The Secretary of State certified that the First OCC articles of organization were "cancelled" on July 1, 2010. See Plaintiff's Exhibit 9. Because the certificate and fee were not filed on the due date of July 1, 2007, the articles were automatically cancelled on the third anniversary of the due date.

Even if the First OCC had attempted to reinstate its "good standing," however, it could have done so only by choosing another name, because after its name protection had been lost, the Secretary of State issued articles of organization to a different entity under the name of Oklahoma Casing Crews LLC. See, e.g., Libby Anne Mercer, Avoiding the Premature Death of an LLC, 79 O.B.J. 45 (2008) (outlining the pitfalls of failing to file an annual certificate of business activity, including the possibility that the LLC must choose another name to reinstate its good standing when the name has been issued to another entity).

[59] Plaintiff's Exhibit 74, at 28, ¶ 3.

On July 2, 2008, Moses, Barnes, and the First OCC (hereinafter collectively referred to as "Moses") obtained an Emergency Ex Parte Restraining Order and Notice of Hearing ("TRO") based upon the allegations in the Amended Petition.[60]  The TRO restrained Duncan and Seeberger from doing the following "absent a written majority vote of members [of the First OCC] or further Order of [the Creek County court]:"  acting as agents for plaintiffs; transferring property or funds; subjecting any plaintiff to liabilities; and "conduct[ing] work under name of Oklahoma Casing Crews, L.L.C."[61]  The TRO also provided that certain items of property, which consisted of the Big Truck and Equipment, were to be  "held in trust, not to be transferred, encumbered, damaged, dissipated, wasted, sold, destroyed or otherwise reduced in value."[62]  A hearing on the TRO was set for July 10, 2008.

_____

[60]Plaintiff's Exhibit 74, at 25.

[61]Plaintiff's Exhibit 74, at 26, ¶¶ 1, 2, 3, and 5.  Moses had learned from a vendor that Seeberger had purchased some equipment under the name of Oklahoma Casing Crews LLC. Moses did not know that Seeberger had formed the Second OCC at that point, and was concerned that Seeberger was subjecting the First OCC to liabilities without his consent.  The supplier showed Moses receipts and checks indicating that Seeberger had purchased equipment identical to the equipment the First OCC had purchased to outfit its Big Truck. Moses knew that Seeberger was not using the First OCC's funds to purchase the equipment, however, because the checks written by Seeberger to purchase the equipment were not drawn on the First OCC's bank account at First United  but instead were drawn on an account at a different bank.  When Moses later learned that Seeberger had indeed registered a new company with the Secretary of State under the name Oklahoma Casing Crews LLC, he did not retract his accusations that Duncan and Seeberger were operating the First OCC without his consent and subjecting the First OCC to liabilities.

[62]Plaintiff's Exhibit 74, at 26, ¶ 6.  The TRO also provided that "any and all other property items in Defendants' control or possession belonging to any Plaintiffs" were subject to the same restrictions, but Moses did not establish that Duncan or Seeberger controlled or possessed any property belonging to Moses, or any property belonging to the First OCC other than the Big Truck and Equipment.

Whether Duncan and Seeberger were properly served with the summons, Amended Petition, and TRO is disputed.[63]   When Duncan and Seeberger failed to appear at the preliminary hearing, the Creek County judge entered a Restraining Order.[64]

The Restraining Order expanded the relief granted in the TRO.  In particular, the Restraining Order required Duncan and Seeberger to –

• "not operate or conduct the business of Oklahoma Casing Crews L.L.C. without the written unanimous consent of all members";[65]

• "take no actions to expose Plaintiffs to any liabilities . . . in the form of loans, debts, credit agreements, contracts or otherwise absent a written majority vote of members";[66]

• "report [within ten days] any and all current and past business activities that may expose Plaintiffs to liabilities" and disclose "[a]ny and all property transfers, funds received and expenses paid, as well as contracts entered";[67]

• "not allow any of Plaintiffs' assets or income to be dissipated, wasted, transferred or otherwise converted to personal or other business uses without the unanimous written consent of Plaintiffs";[68] and

---

[63]On July 8, 2008, a  process server served the TRO on Attorney Seeberger. Thereafter, Attorney Seeberger was advised that Ms. Cinocca did not consent to counsel accepting service.  The process server retrieved the Summons, Amended Petition, and TRO from Attorney Seeberger.  Because Attorney Seeberger did not believe that Duncan and Seeberger had been served as of July 10, 2008, no one appeared on their behalf at the preliminary hearing.  Plaintiff's Exhibit 74, at 50-52.  Ms. Cinocca appeared, however, and presented the Restraining Order.

[64]As a matter of law, a temporary restraining order expires once a restraining order is issued.  See Jennings v. Elliott, 1939 OK 554, 97 P.2d 67, 70.

[65]Restraining Order, Plaintiff's Exhibit 74, at 47, ¶ 1.

[66]Id., ¶ 2.

[67]Id., ¶ 3.

[68]Id. at 48, ¶ 4.

- "cease conducting any business on or behalf [sic] of any Plaintiffs without written unanimous consent of all Plaintiffs."[69]

With respect to the Big Truck and Equipment, the Restraining Order provided that the property "shall be preserved by Defendants, held in trust, not to be transferred, encumbered, damaged, dissipated, wasted, sold, destroyed or otherwise reduced in value. . . . Defendants may return all of said items to Plaintiffs and obtain written proof of delivery, but if Defendants do not, they must comply with this Restraining Order."[70]

In August 2008, Moses found the Big Truck in Doyle Matthew's yard, but he claimed that it was stripped of all equipment but the big surface tongs and some elevators. Moses made no effort to take possession of the Big Truck at that time. Some of the equipment that Moses contends was on the Big Truck when it was left in Duncan's yard was never located (collectively the "Lost Equipment").[71]

It was not established that Duncan or Seeberger had possession or control of the Lost Equipment prior to the entry of the Restraining Order. In addition, there was no evidence that Duncan and Seeberger used, secreted, damaged, or sold the Lost Equipment, or in any way willfully or maliciously withheld the Lost Equipment from Moses or the First OCC.

---

[69]Id., ¶ 5.

[70]Id., ¶ 6. Moses did not get an order commanding the sheriff to immediately seize the property and deliver it to plaintiffs, because they did not want, or could not afford, to post a bond in the amount of double of the value of the property which is required to secure the potential damages for wrongfully taking the property. Trial Testimony of Ms. Cinocca. See, e.g., 12 O.S. §§ 1571-76.

[71]Moses contends that when he later seized the Big Truck and Equipment, and the equipment owned by D and S Casing, in February 2009, one set of 5 ½ inch pipe elevators (valued at $1,000), two sets of 4 ½ inch pipe elevators ($2,000), two 5 ½ inch pipe slips ($1,600), and one set of 8 5/8 inch slips ($1,500) were not accounted for. Plaintiff's Exhibit 74, at 293.

Nor did Moses present any evidence that Duncan or Seeberger "transferred, encumbered, damaged, dissipated, wasted, sold, [or] destroyed" the Big Truck and Equipment after the Restraining Order was entered.  Although Moses claims that Duncan and Seeberger allowed the Big Truck to be "reduce[d] in value," he failed to present any evidence of any reduction in value from the date of the Restraining Order to the date of the ultimate sale of the Big Truck and Equipment.[72]

After Barnes was finally served with the petition in the Bristow Division Case, he filed a special appearance and contended that Duncan and Seeberger lacked the capacity to sue on behalf of the First OCC because "standing to act on behalf of the corporation [sic] has already been granted to Defendants in [the Sapulpa Division Case]," apparently by virtue of the entry of the Restraining Order.[73]  At a hearing in the Bristow Division Case, all parties agreed to liquidate the assets of the First OCC.[74]  In addition, because Duncan and Seeberger's request for winding up, accounting, and dissolution could be accomplished in conjunction with the case filed by Moses and Barnes, the parties agreed to consolidate the

---

[72]The Court notes that Moses and Barnes abdicated their own responsibility to maintain and protect the Big Truck and Equipment by leaving the same in Duncan's yard and failing to insure it.  Moses was aware that Barnes cancelled the First OCC's insurance policies in October 2007.  There is no evidence that Duncan or Seeberger had notice that the Big Truck and Equipment were uninsured.  Although the First OCC had cash on hand when the business ceased in October 2007, and Barnes continued to collect outstanding receivables thereafter on behalf of the First OCC, Barnes did not use any of those funds to insure or otherwise protect the assets of the First OCC for the benefit of the members.

[73]Barnes' Special Entry of Appearance and Answer to Petition with Application for Hearing as to Affirmative Defenses, Plaintiff's Exhibit 75, ¶ 9(b),

[74]Plaintiff's Exhibit 75 (Docket entry dated September 26, 2008).  Ms. Cinocca testified that Duncan and Seeberger agreed to advise her whether they desired to purchase the First OCC's property, but they did not do so.

Bristow Division Case into Sapulpa Division Case (hereinafter, the "Creek County Litigation").[75]

On November 21, 2008, Moses filed a motion for an order to sell the Big Truck and Equipment.[76]  A hearing on the motion was set for January 8, 2009.[77]  Because Duncan and Seeberger had previously agreed that the Big Truck and Equipment should be sold, they did not contest the motion, and neither they nor their counsel appeared at the January 8th hearing. Ms. Cinocca appeared, the motion was granted, and a hearing to "settle the journal entry" was set for January 22, 2009.[78]

On January 16, 2009, Ms. Cinocca sent Attorney Seeberger a notice of the January 22nd hearing, to which she attached a proposed order authorizing the sale of the Big Truck and Equipment.  The notice provided that "in case you do not so appear judgment may be rendered against you *in accordance with [the proposed order] attached*."[79]  Because the proposed order merely granted the relief set forth in the unopposed motion (*i.e.*, allowing the sale of the Big Truck and Equipment), Attorney Seeberger did not attend the hearing.  At the hearing, however, Ms. Cinocca presented an order that contained relief that had *not* been requested in the motion, had *not* appeared in the proposed order, and to which Duncan,

---

[75]Id.

[76]Motion to Sell Property, Plaintiff's Exhibit 74, at 66-67.

[77]Plaintiff's Exhibit 74, at 68.

[78]Plaintiff's Exhibit 74, at 70.

[79]Plaintiff's Exhibit 74, at 72 (emphasis added).

Seeberger, and Attorney Seeberger had *not* consented (referred to herein as the "Unapproved Sale Order").[80]  In particular, the proposed order was augmented by the following paragraph:

> IT IS FURTHER ORDERED that all property in the possession of Defendants *or any entities owned in part or controlled by them* should be delivered to Plaintiffs within seven days.[81]

It is at that point that Moses began asserting that the accounting of the First OCC must include not only the assets and liabilities of the First OCC, but also the assets (but apparently not the liabilities) of the Second OCC and D and S Casing, on the theory that the latter entities constituted a "continuation" of the First OCC.  Seeberger and Duncan repeatedly advised Ms. Cinocca that the Second OCC, and thereafter D and S Casing, were wholly separate entities unrelated to the First OCC, and thus, that their assets were not assets of the First OCC.  However, Ms. Cinocca, in an effort to control the narrative, continued to insist that Duncan and Seeberger had been operating, profiting from, and incurring debt on behalf

---

[80]Ms. Cinocca introduced a Fax Transmittal dated January 22, 2009 (the date of the hearing) in which she purported to send a copy of the Unapproved Sale Order to Attorney Seeberger with instructions to "review and execute."  Her fax message did not point out that the attached order was different than the proposed order attached to the notice of hearing. Moreover, the document lacks a "proof of transmission" page and no evidence was presented that Attorney Seeberger ever received the fax, either before or after the Unapproved Sale Order was entered.  See Plaintiff's Exhibit 65.

[81]Plaintiff's Exhibit 74, at 77 (emphasis added).  Although the relief in the "extra paragraph" was not requested in the motion, or contained in the proposed order, Ms. Cinocca defended her inclusion of the "extra paragraph" in the order presented to the Creek County judge as being "in the spirit and intent of the pleadings that had been filed before."  Trial Testimony of Ms. Cinocca.  However, there is no evidence in the Creek County Litigation record that Duncan or Seeberger (or the Second OCC or D and S Casing) had any notice that Moses (or the First OCC) claimed rights in any assets in their possession other than the Big Truck and Equipment.  Moreover, read literally, the "extra paragraph" actually required Duncan and Seeberger to deliver *all property in their possession* to Moses, which was hardly "in the spirit and intent" of any of the pleadings in the record.

of the First OCC without the consent of Moses and Barnes, notwithstanding the facts and law that undermined her theory.

After the entry of the Unapproved Sale Order, Moses picked up the Big Truck and the remaining equipment from Doyle Matthews' yard.  A few days later, he appeared at Duncan's residence with the Unapproved Sale Order in hand, and over Duncan's objection, seized various pieces of equipment, including tongs, elevators, slips and chains, and loaded them onto the First OCC's Chevy Silverado, which Moses had been driving.  Duncan advised Moses that "he was getting the wrong equipment, that [this equipment] had nothing to do with the original company."[82]

Moses believed that one pair of tongs he seized were owned by the First OCC. Duncan advised Moses that the tongs were purchased by the Second OCC[83] and that the First OCC's tongs were in Doyle Matthews' shop.  The remaining equipment seized by Moses (except for the set of elevators owned by a third party) had also been purchased by the Second OCC and was then owned by D and S Casing.[84]  Moses refused to return the property owned by D and S Casing on the ground that the Unapproved Sale Order permitted him to seize and sell any "property in the possession of Defendants *or any entities owned in part or controlled by them*."[85]

---

[82]Duncan Tr. at 53.

[83]Seeberger produced a receipt establishing that he purchased a pair of tongs for $19,500 in June 2008, long after the demise of the First OCC.

[84]See Defendant's Exhibits 26-28.

[85]Plaintiff's Exhibit 74, at 77 (emphasis added).  Attorney Seeberger filed a Motion to Suspend Sale and for Return of Property, advising the Creek County court that the property seized was purchased by entities owned by Duncan and Seeberger after the First

In May 2009, the Big Truck and Equipment (less the Lost Equipment), other assets owned by First OCC in Moses's possession, including the Chevy Silverado, and the seized equipment owned by D and S Casing were all sold at auction for a total of $47,000. Regrettably, the timing of the auction could not have been worse, as demand for oil and gas, and thus for oilfield equipment, was at its lowest point in a decade.[86]  Consequently, the auction did not generate as much as it might have had the assets been sold earlier.

The seizure of D and S Casing's equipment effectively put it out of business. Seeberger and Duncan remained liable on their guaranty of the Second OCC's debt to the bank, which proceeds had been used to purchase the 2008 Ford truck and the seized equipment.  None of the proceeds of the sale of the seized equipment were applied against the Second OCC's bank loan.[87]  The bank eventually repossessed the D and S Casing's 2008

---

OCC ceased operating, and therefore was outside the scope of the sale order.  Plaintiff's Exhibit 74, at 81-83.  In response to the motion, Ms. Cinocca contended, among various technical objections, that the Unapproved Sale Order should not be vacated because "Defendants [did] not appear at the hearing for the sale of property despite being given two opportunities to do so."  Plaintiff's Exhibit 74, at 92.  She did not advise the court that relief in the order presented for entry at January 22nd hearing exceeded the relief requested in the motion and set forth in proposed order, and that the order was entered without notice to Duncan and Seeberger (or to D and S Casing, which owned the property) that such expanded relief was sought.

[86]The Court takes judicial notice that, according to Baker Hughes Incorporated, whose rig counts are generally recognized as a financial barometer for the drilling industry and its suppliers, the number of operating rigs in Oklahoma and the United States increased to unprecedented levels in 2008, but dramatically fell by approximately 50% in early 2009. Thus, the auction, held in May 2009, occurred when there was little demand for such equipment.  See Baker Hughes Historical Rig Count Chart, Appendix A, obtained on October 20, 2011, from http://investor.shareholder.com/bhi/rig_counts/rc_index.cfm.

[87]Nothing presented at trial accounts for the disposition of the $47,000 realized at the auction.

Ford truck and liquidated the certificates of deposit pledged by Seeberger's parents in order to satisfy the debt.

Moses did not commence discovery in the Creek County Litigation until June 2009, when he served various subpoenas for depositions and for production of documents, including documents related to the Second OCC and D and S Casing.[88]  On July 23, 2009, Duncan and Seeberger were deposed and questioned extensively about the formation and operation of the Second OCC and D and S Casing.[89]

---

[88]Subpoenas for the Purpose of Deposition and for the Production of Documents issued to Duncan, individually and as representative of Oklahoma Casing Crews L.L.C. and D and S Casing L.L.C., and to Seeberger in the same capacities, Plaintiff's Exhibit 74, at 162-87.  The subpoenas requested virtually all documents related to the First OCC, the Second OCC, and D and S Casing.

[89]Duncan and Seeberger did not produce bank records relating to the Second OCC or D and S Casing at their depositions, contending that they were not relevant to winding up the First OCC.  Seeberger Tr. at 28-29, 126-27, 189.  Ms. Cinocca insisted that the only Oklahoma Casing Crews LLC ever in existence was the First OCC, declaring to Attorney Seeberger that "whether they have a new FEIN or not, there's not supposed to be more than one in that name.  There's only one right now in existence, and that's who we have an order that we represent, that's my client, Oklahoma Casing.  They're holding on to these bank account records and they're not giv[ing] them to us.  We're supposed to do this accounting and they've got all this money that they've received there and expenses they've paid out, and they have not given me the documents that we need to finish our accounting.  They're trying to say it's a different FEIN.  The only Oklahoma Casing that exists right now is the one that he's [Seeberger] got the bank account for and I'm counsel for them."  Id. at 189-90.  Seeberger reminded Ms. Cinocca that the only bank account used by the First OCC was the First United account, which was controlled by Barnes.  Id. at 190.  Nevertheless, Ms. Cinocca continued to demand all the bank records for the Second OCC and D and S Casing, claiming that they were needed to complete the accounting for the First OCC.

Earlier, however, Ms. Cinocca's office confirmed what Seeberger and Duncan had asserted all along, that the First OCC had been suspended when the Second OCC was formed, and that the Second OCC was in fact a separate company formed by Seeberger.  Fee Statements, Plaintiff's Exhibit 71, at entries dated April 30, 2009, and July 13, 2009 to July 17, 2009 (regarding obtaining documents from the Oklahoma Secretary of State for three companies, and discussing the First OCC's "inactive status").  However, rather than admit that the First OCC was no longer recognized, and that the Second OCC was a separate entity,

On or about July 28, 2009, Moses filed a Second Amended Petition in the Creek County Litigation, joining D and S Casing as a defendant, and seeking to include the assets, revenues, and expenses of the Second OCC and D and S Casing in the accounting for the First OCC.[90]  In addition, he sought damages for breach of the operating agreement, breach of fiduciary duty, fraud and deceit, and unjust enrichment for excluding Moses and Barnes from participating in the Second OCC and D and S Casing.

In the Second Amended Petition, Moses alleged that the First OCC "was formed with the Secretary of State on December 27, 2004, until it was suspended, then refiled on November 20, 2007 by Michael Seeberger.  Oklahoma Casing Crews, L.L.C. is in good standing."[91]  Under Oklahoma law, however, a limited liability company cannot be restored

_____

Ms. Cinocca alleged that by filing new articles of organization for Oklahoma Casing Crews LLC, Seeberger *reinstated* the First OCC.  See Second Amended Petition, Plaintiff's Exhibit 74, at 115, ¶ 3.  This assertion lacks any factual or legal basis, however.  See footnotes 92 and 94, supra.

Duncan and Seeberger eventually provided the Second OCC's and D and S Casings' bank records to Ms. Cinocca, and she forwarded them to Mr. Hinkle, the accountant jointly retained to determine "the amount of payments made to the four shareholders [of the First OCC] to determine whether the distributions to the shareholders have been equal." Plaintiff's Exhibit 41.  Mr. Hinkle included in his accounting the distributions to Duncan and Seeberger from the Second OCC and D and S Casing, which inflated the amount that Duncan and Seeberger supposedly received from the First OCC, resulting in the appearance that Duncan and Seeberger had taken "excess withdrawals," when in fact, Moses's withdrawals from the First OCC exceeded Duncan's and Seeberger's.  Id.  Nothing in Mr. Hinkle's report purports to account for Barnes's and Moses's disposition of the $47,000 auction proceeds, however.

[90]Second Amended Petition, Plaintiff's Exhibit 74, at 115-33.

[91]Id., ¶ 3.

to good standing unless and until it files its delinquent annual reports.[92]  Moses and Ms.

Cinocca *knew* that Seeberger did not file the annual reports required to restore the First OCC.

Only one week earlier, Seeberger had testified in his deposition that he filed Articles of

Organization for a *new entity*, using the available name of Oklahoma Casing Crews LLC, and

that he paid the fee required for filing Articles of Organization for the new entity.[93]  He

specifically denied reinstating the First OCC.[94]  There is no evidence that *anyone* ever filed

annual certificates or paid fees to restore the First OCC to the status of good standing.  Thus,

Moses, though his counsel, knowingly falsely alleged that the First OCC had been reinstated

and was in good standing.[95]

_____

[92]A limited liability company "that has ceased to be in good stating . . . by reason of the failure to file the annual certificate with the Secretary of State *may be restored* to and have the status of a domestic limited liability company in good standing . . . upon the filing of the annual certificate for each year for which the domestic limited liability company . . . neglected, refused or failed to file the annual certificate . . . ."  18 O.S. 2006, ¶ 2055.2(E) (emphasis added).

[93]Seeberger Tr. at 33-36.  See Defendant's Exhibits 5, 6 and 7.

[94]Seeberger Tr. at 29 (Ms. Cinocca: "I'm asking about the Oklahoma Casing that you continued to do business on when you bought the name from the Secretary of State." Seeberger:  "We did not continue to do business with [sic] Oklahoma Casing.  Oklahoma Casing Crews with Jeff Duncan and myself is a new – was a new entity, it's not a continuation."); and at 126 (testifying that D and S Casing was "not a continuation [of the First OCC], though; this is a new company.")

[95]In addition to misrepresenting the status of the First OCC, Ms. Cinocca failed to appreciate that because the First OCC was not in good standing, under the Oklahoma Limited Liability Act, the First OCC was barred from pursuing its claims in the Creek County Litigation.

In later pleadings filed in the Creek County Litigation, Ms. Cinocca *again* alleged that the First OCC had been "reinstated" by Seeberger on November 20, 2007.  Plaintiffs' Answer to Defendants' Cross-Petition, Plaintiff's Exhibit 74, at 261, ¶ 2.  Even in her testimony at trial in this proceeding, Ms. Cinocca stated, as a fact, that the Second OCC was a "reinstatement" of the First OCC.

The erroneous contention that Duncan and Seeberger continued operating *the First OCC* to the exclusion of Moses was central to Moses's claim that Duncan and Seeberger somehow violated his rights.  It is clear to this Court that the only two members of the Second OCC and D and S Casing were Duncan and Seeberger, and that Moses had no interest whatsoever in those entities.  Moreover, neither of those entities competed with or usurped any business opportunities of the First OCC (which ceased operating in October of 2007), or caused Moses any harm.  As a matter of law, Moses was not liable on any debts incurred by the Second OCC, as he was not a member of that entity.  To the extent that the name Oklahoma Casing Crews LLC itself had any value, Moses failed to present any evidence quantifying the value.  Neither Duncan or Seeberger ever profited from using the name.

After the Second Amended Petition was filed, Duncan and Seeberger requested the Creek County judge to remove Ms. Cinocca as counsel for the First OCC, since they, as owners of one-half of the company, had not consented to her retention, and indeed, she was not acting in the best interests of all its members.[96]  The request was denied[97] and the case was set for trial on December 8 and 9, 2009.[98]

---

[96]See Application to Remove Counsel, Plaintiff's Exhibit 74, at 136. In responding to the application, Ms. Cinocca contended that the entry of the TRO, the Restraining Order, and the Unapproved Sale Order established that only Moses and Barnes were authorized to act on behalf of the First OCC, and therefore they were entitled to employ whoever they chose without obtaining a majority vote of the members.  Plaintiff's Exhibit 74, at 142.  She also cited provisions of the Oklahoma limited liability act that had no relevance to the motion whatsoever.

[97]See Court Minute, Plaintiff's Exhibit 74, at 200; Order, id., at 238.  The Order did not contain any findings by the court.

[98]Order, Plaintiff's Exhibit 74, at 239.

On September 9, 2009, Duncan and Seeberger filed an Answer to the Second Amended Petition and a Cross-Petition, in which they continued to deny and oppose Moses's contention that the Second OCC and D and S Casing constituted a continuation or reinstatement of the First OCC.  In the Cross-Petition, Duncan and Seeberger sought an accounting for the First OCC; damages against Moses and Barnes for taking actions on behalf of the First OCC without their consent or vote, including unilaterally terminating the business of the First OCC; damages for taking unauthorized withdrawals and using the First OCC's funds for personal expenses; damages for converting the property of the Second OCC and D and S Casing; and damages for willful and wanton interference with D and S Casing's business.[99]

On September 30, 2009, Moses filed a Motion to Dismiss the Cross-Petition,[100] seeking to strike Duncan and Seeberger's Answer to the Second Amended Petition, and to dismiss the Cross-Petition, on the ground that they were filed three weeks late and without leave of court.[101]  Accordingly, Moses requested that judgment by default be entered against Duncan, Seeberger, and D and S Casing.[102]  The motion was set for hearing on November 12, 2009.

D and S Casing was finally served with a summons and the Second Amended Petition on October 12, 2009.  D and S Casing failed to timely file an answer.  On November 10,

---

[99]Answer and Cross-Petition, Plaintiff's Exhibit 74, at 201-11.

[100]Motion to Dismiss, Plaintiff's Exhibit 74, at 241-60.

[101]Id. at 243-44.

[102]Id. at 242.  D and S Casing had not yet been served, however.

2009, Moses filed a Motion for Default Judgment for Failure to Answer, seeking default judgment against D and S Casing.[103]

On the morning of November 12, 2009, Attorney Seeberger filed a Motion for Continuance, stating that he had a hearing in another jurisdiction and advising that Ms. Cinocca did not object to a continuance.[104]  At the same time, D and S Casing filed a motion to continue the trial because it had retained separate counsel.[105]  D and S Casing recited that Ms. Cinocca did not object to striking the trial dates.

Because Attorney Seeberger believed he had an agreement with Ms. Cinocca to continue the November 12th hearing, and because he had called to advise the court of the agreement, he did not appear at the hearing on behalf of Duncan and Seeberger.  Ms. Cinocca appeared.  The court minute noted: "Argument presented by Ms. Cinocca.  No answer[s] filed. [Plaintiffs' motion to dismiss] and "request f/default judgment sustained & granted. Set 11/30/09 @ 10:00 a.m., in Okemah f/damages."[106]  The minute does not indicate whether the request for default judgment was granted against Duncan and Seeberger only, or whether the motion for default judgment filed on November 10, 2009, against D and S Casing was also granted.  The record of the Creek County Litigation presented herein did not include a

_____

[103]Plaintiff's Exhibit 74, at 269-70.

[104]Plaintiff's Exhibit 74, at 275-76.

[105]Plaintiff's Exhibit 74, at 273-74

[106]Plaintiff's Exhibit 74, at 278.

transcript of the hearing on November 12, 2009, and therefore there is no record of the factual basis for the entry of default judgment.  The December 8th trial date was stricken.[107]

On November 18, 2009, Moses filed an Application for Indirect Contempt Citation, accusing Duncan and Seeberger of "knowingly, willfully and maliciously disobeying and violating the orders of this Court."[108]  Specifically, Moses alleged that they violated the Restraining Order entered July 10, 2008, and the Order Allowing Sale of Property entered January 29, 2009 (*i.e.*, the Unapproved Sale Order), by failing to turn over one set of 5½ inch pipe elevators, two sets of 4½ inch pipe elevators, three sets of pipe slips, and miscellaneous tools (*i.e.*, the Lost Equipment).[109]  The contempt citation also alleged that by operating the Second OCC and D and S Casing, Duncan and Seeberger further violated the Restraining Order.[110]  The contempt charge was never set for hearing or adjudicated by the Creek County judge.

On November 20, 2009, Moses filed a Motion to Assess Expert Fees and Costs, complaining that Duncan and Seeberger did not pay bills of Mr. Hinkle, the jointly retained accountant, which Ms. Cinocca sent to Attorney Seeberger on October 28, 2009.[111]

---

[107]Plaintiff's Exhibit 74, at 290.

[108]Plaintiff's Exhibit 74, at 291.  Again, Moses, through Ms. Cinocca, falsely states that the First OCC is in good standing.

[109]Id. at 293.

[110]Id. at 297-300.

[111]Id. at 302.

On November 30, 2009, Duncan and Seeberger filed a Motion to Vacate Default Judgment,[112] essentially asserting that Ms. Cinocca obtained the default judgment by fraud, in that she lulled Attorney Seeberger into believing that she supported his request for a continuance and he assumed she would not present the motion without his appearance.  He also complained that no notice had been given that the motion for default judgment against D and S Casing, filed on November 10, 2009, would be considered on November 12, 2009.

At the hearing on November 30, 2009, the parties appeared with their jointly retained accountant, Mr. Hinkle.  Before the hearing began, however, the parties met with Mr. Hinkle and a settlement was reached, which terms were read into the record by Ms. Cinocca and acknowledged by the parties.[113]  Copies of the parties' notes, and a calculation of the amount of distributions, expense reimbursements, and other payments made to each member were

---

[112]Plaintiff's Exhibit 74, at 339-45.

[113]Transcript of Proceedings held on November 30, 2009 ("Tr. 11/30/09"), Plaintiff's Exhibit 74, at 458-82.  The copy of Mr. Hinkle's Report attached to the transcript is not complete, as two pages of the spreadsheet are missing. A complete copy of the report was admitted as Plaintiff's Exhibit 41.

Also on November 30, 2009, Duncan and Seeberger filed a belated response to Moses's motion to dismiss their cross-claims, which had already been granted on November 12, 2009.  Id. at 346-48.

admitted into the record.[114]   The parties withdrew all pending motions except for the

---

[114]Id.   The lop-sided settlement included provisions under which Duncan and Seeberger individually were saddled with payment of *all* the First OCC's alleged obligations, which included lease payments to Moses for part of 2005, all of 2006, and five months of 2007, in the amount of $92,173.02.  For some reason, Moses and Barnes were not required to contribute to the payment of the First OCC's alleged obligations to Moses, although together they owned one-half of the entity and profited from the use of Moses's Truck and Equipment during 2005 through 2007.  Tr. 11/30/09, at 472.

The settlement also required Duncan and Seeberger to pay to the First OCC the "lost value of property sold at auction" in the amount of $70,697.50; "lost value of one ton truck" in the amount of $12,500.00 (the Court notes that the one-ton Chevy Silverado was at all times after October 2007 in Moses's possession; there is no evidence that Duncan or Seeberger did anything to diminish the value of that vehicle); "all other damages, including punitive" in the amount of $220,000.00; and "actual attorney and expert witness fees, including costs" in the amount of $63,471.18, as well as additional fees for "collection of outstanding receivables and other necessary final accountings to close the company."  Tr. 11/30/09, Plaintiff's Exhibit 74, at 473.  These payments were to be made to the First OCC and distributed *only* to Moses and Barnes.  In addition, Duncan and Seeberger were to be "jointly and severally liable to all Plaintiffs [*i.e.*, the First OCC, Moses, and Barnes] for all sums referenced herein owed by them which are not subject to distribution to them or other offset."  Id. at 473.

In addition, Duncan and Seeberger were to reimburse "all Plaintiffs" for excess withdrawals/distributions in the amounts of $13,816.98 and $7,716.98, respectively.  Moses was to offset his excess withdrawal liability against the judgment for lease payments.

Again, the Court notes that Mr. Hinkle included in his accounting draws taken by Duncan and Seeberger from the revenues of businesses they formed *after* the First OCC ceased doing business.  Because Barnes and Moses had no interest in those entities, those draws should not have been included in the First OCC's accounting.  In addition, Mr. Hinkle's accounting did not attribute to Moses's or Barnes's draw accounts the cash advances taken by Moses and Barnes, or payments made by the company for their personal expenses (including payments made by the company to pursue their litigation against Duncan and Seeberger).  Thus, Mr. Hinkle's report overstated Seeberger's and Duncan's distributions from the First OCC, and understated those made to Barnes and Moses, resulting in an inaccurate accounting.

Seeberger testified that he did not recall seeing the handwritten settlement agreement that was presented to the Creek County court, and that he agreed to settle simply in order to put an end to the litigation.

Application for Indirect Contempt Citation, which the Creek County judge left pending.[115]

On March 8, 2010, Moses filed a Motion to Settle Journal Entry, to which was attached a proposed order.  In the proposed order, Ms. Cinocca represented that "Defendants Jeff Duncan and Michael Seeberger and their counsel failed to appear at the hearing on November 12, 2009 despite having notice of the hearing.  Defendants Duncan and Seeberger failed to file any answer or objection to the Motion to Dismiss with a request Crossclaims of Defendants be dismissed and for default judgment against all Defendants for failure to answer [sic]."[116]  As stated above, although Attorney Seeberger had been advised by Ms. Cinocca that she had agreed to continue the hearing, she nevertheless appeared and presented her motions and argument, and obtained (1) judgment by default, (2) dismissal of all Duncan and Seeberger's claims against Moses, (3) cancellation of the trial on the merits, and (4) a date for a hearing on damages.

On March 10, 2010, the Creek County judge set the Motion to Settle Journal Entry for April 8, 2010, and sent notice to counsel.[117]  However, on March 19, 2010, prior to the hearing date, the Creek County judge entered the proposed order without modification (the "March 19th Order") and struck the hearing, depriving Duncan and Seeberger of the opportunity to contest the contents thereof.[118]  Because the March 19th Order did not

---

[115]Tr. 11/30/09, at 10, Plaintiff's Exhibit 74, at 467; Court Minute, Plaintiff's Exhibit 74, at 349.

[116]Plaintiff's Exhibit 74, at 353.

[117]Plaintiff's Exhibit 74, at 356.

[118]Plaintiff's Exhibit 74, at 357-58.

adjudicate damages, and anticipated future proceedings on damages, it did not constitute a final order.[119]

On March 29, 2010, Moses, through Ms. Cinocca, filed another Motion to Settle Journal Entry to which a proposed Journal Entry of Judgment and Findings of Fact and Conclusions of Law ("Journal Entry") was attached.  The Journal Entry did not fairly reflect the Settlement.   For example, the Journal Entry made extensive findings of fact notwithstanding that no trial on the merits had been held.[120]  Also, Ms. Cinocca characterized $220,000 of the settlement amount as punitive damages.   Duncan and Seeberger did not agree to "punitive damages" in the amount of $220,000; rather, they agreed to pay $220,000 to resolve all issues not addressed by the other specific damage calculations contained in the settlement.[121]  In addition, Ms. Cinocca attempted to include a provision that "Judgment is granted in favor of Plaintiffs on their Application for Contempt and all sums due and payable herein are also awarded as damages therefore [sic]," even though the Creek County judge had

---

[119]Jones v. Tubbs, 1993 OK 118, 860 P.2d 234, 235-36 (default judgment that reserved the issue of certain damages for later determination was not a final appealable order or judgment).

[120]Proposed Journal Entry, Plaintiff's Exhibit 74, at 362-77.  For example, in paragraph 81, the court purportedly "finds by clear and convincing evidence that the Defendants . . . recklessly disregarded its duty to deal fairly and to act in good faith with Plaintiffs."  Id. at 376.

[121]Proposed Journal Entry, Plaintiff's Exhibit 74, at 374.  In her recitation to the Creek County court on November 30, 2009, Ms. Cinocca characterized the sum of $220,000 as for "all other damages, including punitive damages, lost time, lost income to the company, and those that stem from breach of fiduciary duty, etcetera."  Tr. 11/30/09, Plaintiff's Exhibit 74, at 462.  There was no agreement as to what portion of the $220,000, if any, constituted punitive damages.  The proposed journal entry also included judgment against Duncan and Seeberger in favor of Ms. Cinocca's firm (even though she was not a party to the litigation) in the amount of $111,037.90.

never even set the contempt matter for hearing, and in fact stated that the contempt matter would be held in abeyance.[122]

Ms. Cinocca requested that the judge enter the Journal Entry as submitted without a hearing.[123]  This time, the judge declined to enter the order submitted by Ms. Cinocca and requested that a "new Motion to Settle be submitted for hearing May 20, 2010, at 1:30."[124] Ms. Cinocca did not file her "new Motion to Settle" until May 20, 2010, and again requested that it be entered without adequate notice or a hearing.[125]  The "new" Journal Entry was identical to the earlier-filed version.

On May 27, 2010, the Creek County judge set the matter for hearing at 1:30 p.m. on June 3, 2010.   Early in the morning of June 3, 2010, Duncan and Seeberger each electronically filed a petition herein for relief under Chapter 7 of the Bankruptcy Code.  Prior to the Creek County hearing, Attorney Seeberger advised both Ms. Cinocca[126] and the Creek County court of the  bankruptcy filings.[127]  At the same time, Duncan and Seeberger filed an objection to the proposed journal entry, contending that it did not "accurately reflect the

---

[122]Plaintiff's Exhibit 74, at 375, ¶ 78.

[123]Plaintiff's Exhibit 74, at 360.

[124]Plaintiff's Exhibit 74, at 380-81.

[125]Id. at 381.

[126]Attorney Seeberger sent notices of the bankruptcies to Ms. Cinocca by facsimile at approximately 8:00 a.m. on June 3, 2010.

[127]Advices of Bankruptcy filed at approximately 9:10 a.m. on June 3, 2010, Plaintiff's Exhibit 74, at 403-06.

agreement of December 4, 2009 [sic], [and] attempts to further degrade and demean the Defendants contrary to settlement agreement."[128]

Notwithstanding actual knowledge of the bankruptcy filings, Ms. Cinocca submitted the Journal Entry to the Creek County judge, who signed it "effective November 30, 2009."[129]   On June 6, 2010, Duncan and Seeberger filed a Motion to Vacate Journal Entry and Brief in Support,[130] in which Duncan and Seeberger correctly recited that entry of the Journal Entry violated the automatic stay. Ms. Cinocca objected to vacating the Journal Entry, contending that it "simply memorializ[ed] what occurred before the Court about six months earlier," that the court "had the right to memorialize those acts," and that "[i]f Defendants had any objections, they should have appeared at the hearing."[131]  As a matter of law, the Journal Entry is void,[132] and thus no final judgment has been entered in the Creek County Litigation.

All told, Ms. Cinocca's firm billed the First OCC in excess of $150,000 to sue Duncan and Seeberger.[133]   The extent of fees incurred by Duncan and Seeberger, if any, was not disclosed.  The quality of legal representation obtained by Duncan and Seeberger in the Creek County Litigation was less than ideal.  Attorney Seeberger's frequent failure to respond to pleadings and discovery requests, attend hearings, or advance appropriate legal

---

[128]Plaintiff's Exhibit 74, at 400, ¶ 2.

[129]Plaintiff's Exhibit 74, at 421.

[130]Plaintiff's Exhibit 74, at 424-32.

[131]Plaintiff's Exhibit 74, at 434-35.

[132]See Ellis v. Consolidated Diesel Electric Corp., 894 F.2d 371, 372 (10th Cir. 1990).

[133]Plaintiff's Exhibits 71, 80, 83, 84 and 87.

arguments prejudiced Duncan and Seeberger's stance in the Creek County Litigation. However, Ms. Cinocca, funded by the First OCC's bank account and receivables (to which Duncan and Seeberger had claims), took unfair advantage of Duncan and Seeberger's limited resources and limited representation, and engaged in overzealous, overreaching, and sometimes unethical and unconscionable tactics that grievously tainted the judicial process and impeded the efficient resolution of the First OCC's dissolution and winding up.  By ignoring the facts and misapplying the law to advance the theory that all of Duncan's and Seeberger's efforts to earn a living after the demise of the First OCC had somehow harmed the First OCC or Moses individually, of which there is no evidence, Ms. Cinocca unjustly, and by trick, obtained an order to seize property to which Moses was not entitled, destroying the economic viability of the Second OCC and D and S Casing, and thereafter aggressively pursued unwarranted tort claims in the Second Amended Petition, leaving Duncan and Seeberger unemployed, in debt, and ultimately bankrupt.

Having conducted a trial and received all the evidence on which Moses's claims were based in the Creek County Litigation, this Court is in a position to determine whether any of the claims (which were never tried or determined on their merits in the Creek County Litigation) fall within the purview of debts excepted from discharge under 11 U.S.C. § 523(a)(2), (a)(4), or (a)(6).

In making the above findings of fact, this Court found the testimony of Duncan and Seeberger credible and consistent.  The evidence did not establish that either of them acted with any intent to deceive or harm Moses while trying to obtain an accounting of the financial transactions of the First OCC, or in forming new ventures to earn a living after

Barnes terminated the business of the First OCC, or in their conduct during the Creek County Litigation.

## III.   Conclusions of Law

To succeed in excepting his claim from discharge, Moses  has the burden of proving by a preponderance of the evidence each element required to render the claim non-dischargeable under one of the statutory exceptions.[134]

### A.   Collateral estoppel/issue preclusion

Moses contends that the various orders and judgments entered in the Creek County Litigation have preclusive effect in this proceeding.  The preclusive effect of a state court judgment in a subsequent federal proceeding is determined by the full faith and credit statute, 28 U.S.C. § 1738, which requires federal courts to apply the preclusion rules of the state in which the judgment was entered.[135]  Oklahoma law regarding the preclusive effect of judgments entered in Oklahoma state courts governs here.

Under Oklahoma law, issue preclusion "ordinarily precludes the relitigation of an issue or fact or law necessarily and finally determined in a previous action between the same parties or their privies."[136]  The general rule, stated in Restatement (Second) of Judgments § 27, and adopted by the Oklahoma Supreme Court,[137] provides as follows:

---

[134]See Grogan v. Garner, 498 U.S. 279, 286-91 (1991).

[135]See Marrese v. Am. Academy of Orthopaedic Surgeons, 470 U.S. 373, 380-81 (1985).

[136]Gordon v. State (In re G.G.), 2004 OK CIV APP 71, 97 P.3d 1155, 1159, *citing* RESTATEMENT (SECOND) OF JUDGMENTS § 27.

[137]See Miller v. Miller, 1998 OK 24, 956 P.2d 887, 897-98 (adopting RESTATEMENT (SECOND) OF JUDGMENTS §§ 27 and 28).

> When an issue of fact or law is actually litigated and determined by a valid and
> final judgment, and the determination is essential to the judgment, the
> determination is conclusive in a subsequent action between the parties,
> whether on the same or a different claim.[138]

But "'when a particular fact is established not by judicial resolution but by stipulation of the
parties, that fact has not been "actually litigated" and thus is not a proper candidate for issue
preclusion' and '[t]his is particularly so when [parties to] the stipulation do[] not "manifest
an intent to be bound in a subsequent action."'"[139]  In addition, preclusion should not be
applied if the party sought to be precluded "did not have an adequate opportunity or incentive
to obtain a full and fair adjudication in the initial action" for certain reasons, including "as
a result of the conduct of his adversary or other special circumstances."[140]

Because the Journal Entry that Moses contends has preclusive value was the result of
a settlement, which included not only a stipulation as to the amount of damages, but also the
withdrawal of Duncan and Seeberger's motion to vacate the default judgment on liability,
and because there is no evidence that Duncan and Seeberger intended to be bound by their
stipulations in a subsequent action, none of the facts or legal conclusions set forth in the
Journal Entry were "actually litigated."  Therefore the Journal Entry, and previous orders
incorporated therein, have no preclusive effect.[141]

---

[138]RESTATEMENT (SECOND) OF JUDGMENTS § 27.

[139]Gordon, 97 P.3d at 1159, *quoting* U.S. v. Botefuhr, 309 F.3d 1263, 1282 (10th Cir.
2002) and citing RESTATEMENT (SECOND) OF JUDGMENTS § 27, comment (e).

[140]RESTATEMENT (SECOND) OF JUDGMENTS § 28(5).

[141]Moses argues that the settlement, as stated on the record in the Creek County
Litigation, constitutes an admission by Duncan and Seeberger that they committed the torts
alleged in the Second Amended Petition and an admission as to amount of damages caused
thereby.  However, Rule 408 of the Federal Rules of Evidence provides that evidence of the

Moreover, the Journal Entry is not a valid order as it was entered after Duncan and Seeberger filed bankruptcy and in violation of the automatic stay. The Journal Entry is void and has no effect.[142] Because no issues of fact or law were "determined by a valid and final judgment" in the Creek County Litigation, the "determinations" contained in the Journal Entry are not preclusive herein.

Finally, even if the Journal Entry had been a valid and final determination of the issues, the Court concludes that preclusion would not be warranted due to "special circumstances." Specifically, the Court concludes that the irregularities in the Creek County Litigation resulting from the underhanded and overreaching tactics employed by Ms. Cinocca in prosecuting Moses's claims, and the passive manner in which Attorney Seeberger defended Duncan and Seeberger, deprived Duncan and Seeberger of an "adequate opportunity" to obtain "a full and fair adjudication" in the Creek County Litigation.

B.    Section 523(a)(4) Claim

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[143]

---

compromise of a claim, and any statements made in negotiation thereof, is inadmissible to prove liability for or the amount of any disputed claim. Thus, the fact that Duncan and Seeberger agreed to settle the Creek County Litigation, and the terms of the settlement, do not establish any element of any of Moses's claims in this proceeding.

[142]See Ellis v. Consolidated Diesel Electric Corp., 894 F.2d 371, 372 (10th Cir. 1990) ("It is well established that any action taken in violation of the [automatic] stay is void and without effect"), citing Kalb v. Feuerstein, 308 U.S. 433 (1940) (actions taken in state court in violation of the automatic stay are null and void, as the state court's jurisdiction over the matter is superseded by the jurisdiction of the bankruptcy court once a bankruptcy petition is filed).

[143]11 U.S.C. § 523(a)(4).

##### 1.   *Fraud or defalcation while acting in a fiduciary capacity*

Whether Duncan and Seeberger were fiduciaries is generally determined by state law, but which fiduciaries defined by state law are considered to be acting "in a fiduciary capacity" for the purposes of determining an exception to discharge under § 523(a)(4) is a question of federal bankruptcy law.[144]   In the Tenth Circuit, "to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor."[145]   In other words, the Tenth Circuit recognizes a cause of action under § 523(a)(4) only where the debtor was designated a trustee over particular money or property (the trust *res*) by virtue of an express or statutory trust, and the debt consists of the loss of the money or property entrusted to the debtor.[146] "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power is sufficient to establish a fiduciary relationship for purposes of dischargeability."[147]   Moreoever, "the fiduciary

---

[144]Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1371 (10th Cir. 1996).

[145]Id. (citations omitted).

[146]Id. (citations omitted).

[147]Id. at 1372 (citations omitted) (debtor/attorney's failure to comply with rules of professional responsibility regarding transactions with client, resulting in loss by client, was not defalcation by fiduciary under § 523(a)(4)).

The Seventh Circuit expands the application of § 523(a)(4) slightly to include violations of "implied" trusts arising from certain contractual relationships where property to which creditor is entitled is lodged in the hands of the debtor, there is inequality between the parties in power or knowledge, and the debtor misappropriates the property.  Follett Higher Ed. Group, Inc. v. Berman (In re Berman), 629 F.3d 761, 769-71 (7th Cir. 2011).

Courts in the Fifth Circuit take an even broader view of the concept of a fiduciary under § 523(a)(4).  For instance, the Fifth Circuit has concluded that because Texas law

relationship must be shown to exist prior to the creation of the debt in controversy." [148]
Constructive, resulting, and implied trusts are excluded, as are other "trusts" that arise only
upon the commission of a wrong (*e.g.*, a trust *ex maleficio*).

Moses contends that Duncan and Seeberger were fiduciaries of a statutory trust
created by 18 O.S. § 2016(5), which articulates duties of a manager of a limited liability
company.  Section 2016(5) states–

> Except as otherwise provided in the articles of organization or operating
> agreement, every manager must account to the limited liability company and
> hold as trustee for it any profit or benefit derived by the manager **without the
> informed consent of the members** from any transaction connected with the
> conduct or winding up of the limited liability company or from any personal
> use by the manager of its property.[149]

This "trust" provision of the limited liability statute is similar in substance to a
provision contained in Oklahoma's former Uniform Partnership Act ("UPA"), which stated–

---

imposes upon corporate officers and directors fiduciary duties to the corporation, which arise
from the control, confidence, and trust placed in those individuals, debts arising from
defalcation or fraud while acting as an officer or director may be excepted from discharge
under § 523(a)(4).  See FNFS, Ltd. v. Harwood (In re Harwood), 637 F.3d 615, 625-26 (5th
Cir. 2011) (officer's breach of "duty to protect [the company] from financial harm" by failing
to record mortgages securing loans he took from the company constituted a defalcation by
a fiduciary, the damages for which were excepted from discharge under § 523(a)(4)).  See
also Andrews v. Wells (In re Wells), 368 B.R. 506, 512 (Bankr. M.D. La. 2006) (Louisiana
law provides that a member of a limited liability company stands in a fiduciary relationship
with the company and its members; thus, the court, following Fifth Circuit precedent, held
that "where a state statute imposes a fiduciary relationship on a debtor by virtue of his
relationship with or office in a business entity, and the debtor actually takes part in managing
the entity," the debtor is a fiduciary under § 523(a)(4).)

[148]Young, 91 F.3d at 1372 (citations omitted).  In Davis v. Aetna Acceptance Co., 293
U.S. 328 (1934), the Supreme Court held that to hold a debt non-dischargeable for
"defalcation while acting as an officer or in any fiduciary capacity," the debtor "must have
been a trustee before the wrong and without reference thereto."  Id. at 331, 333.

[149]18 O.S. 2001, § 2016(5) (emphasis added).

> Every partner must account to the partnership for any benefit, and hold as
> trustee for it any profits derived by him **without the consent of the other
> partners** from any transaction connected with the formation, conduct, or
> liquidation of the partnership or from any use by him of its property.[150]

The Bankruptcy Appellate Panel for the Tenth Circuit has repeatedly held that the "without

the consent" language of the UPA renders the so-called trust a "trust *ex maleficio*" (*i.e.*, a

trust arising from malfeasance), and is therefore excluded from the scope of § 523(a)(4).[151]

Because the limited liability statute relied upon by Moses likewise imposes a trust

over "any profit or benefit derived . . . without the informed consent of the members," this

so-called trust also arises *ex maleficio*.  The statutory fiduciary duty imposed upon a member

of a limited liability company does not arise until after the debt (*i.e.*, the obligation to account

to the company for any unapproved "profit or benefit") is created.  Accordingly, such debt

is outside the purview of § 523(a)(4).

In addition, even if the statute created a "technical trust," the beneficiary of the trust

is the limited liability company itself, not any particular member.  The statute provides that

"every manager must account **to the limited liability company** and hold as trustee **for it** any

---

[150]54 O.S. 1991, § 221(1) (superseded by 54 O.S. 2011, § 1-404).

[151]See, Smolen v. Hatley (In re Hatley) 227 B.R. 757, 760-61 (B.A.P. 10th Cir. 1998),
*aff'd* 194 F.3d 1320 (Table), 1999 WL 728066 (10th Cir.); Holaday v. Seay (In re Seay), 215
B.R. 780, 786 n.4 (B.A.P. 10th Cir. 1997).  See also Murray v. Woodman (In re Woodman),
451 B.R. 31, 38-40 (Bankr. D. Idaho 2011) (similar Idaho statute created a trust *ex
maleficio*); Venus v. Esfahani (In re Esfahani), 2010 WL 3959607 (Bankr. M.D. Fla. 2010)
(Florida statutes did not impose fiduciary duties upon members of limited liability company
for purposes of § 523(a)(4)).  But see Lewis v. Spivey (In re Spivey), 440 B.R. 539, 545
(Bankr. W.D. Ark. 2010) (although Arkansas limited liability company statute imposed
fiduciary duties upon members to account to the company, one member had no fiduciary
duties to other members, and therefore member lacked standing to seek § 523(a)(4) exception
to discharge).

47

profit or benefit derived by the manager without the informed consent of the members."[152]

A member's action is a derivative, rather than direct, action, and an individual member

cannot individually reap the benefit of the company's claim.[153]  Moses has sued, and seeks

to recover, in his individual capacity rather than on behalf of the company, and thus lacks

standing to assert this claim under § 523(a)(4).

For these reasons, Moses has failed to establish a claim under § 523(a)(4) for

defalcation by a fiduciary.

> ## 2. *Embezzlement or larceny*

To the extent Moses seeks to except from discharge a debt arising from

embezzlement, he must prove–

> the fraudulent appropriation of property by a person to whom such property
> has been entrusted, or into whose hands it has lawfully come, and it requires
> fraud in fact, involving moral turpitude or intentional wrong, rather than
> implied or constructive fraud. . . . Consequently, embezzlement requires proof
> of a defalcation or misappropriation of property by one to whom it is entrusted,
> plus proof of fraudulent intent.[154]

---

[152]18 O.S. 2001, § 2016(5) (emphasis added).

[153]See, e.g., White v. Whittle (In re Whittle), 449 B.R. 427 (Bankr. M.D. Fla. 2011)
(members of limited liability company lacked standing to seek exception to discharge of debt
owed to limited liability company); Wallner v. Liebl (In re Liebl), 434 B.R. 529 (Bankr. N.D.
Ill. 2010); Spivey, 440 B.R. at 545 (claim for defalcation by debtor of limited liability
company's property could only be asserted by the limited liability company; the duty, and
the debt, was owed to company; the member's interest was derivative, and therefore the
member lacked standing to prosecute the claim for member's benefit).

[154]Marks v. Hentges (In re Hentges), 373 B.R. 709, 723 (Bankr. N.D. Okla. 2007),
*citing* Klemens v. Wallace (In re Wallace), 840 F.2d 762, 765 (10th Cir. 1988); Hill v. Putvin
(In re Putvin), 332 B.R. 619, 627 (B.A.P. 10th Cir. 2005); Cousatte v. Lucas (In re Lucas),
300 B.R. 526 (B.A.P. 10th Cir. 2003); Bryant v. Tilley (In re Tilley), 286 B.R. 782, 789
(Bankr. D. Colo. 2002).

To the extent he alleges larceny, he must show the "'felonious taking of another's personal property with intent to convert it or deprive the owner of the same.'"[155]

In the Creek County Litigation, Moses alleged that Duncan and Seeberger "converted the accounts, customers, business and equipment of Oklahoma Casing Crews L.L.C. to operation under a new Federal Employment Identification Number and then to D and S Casing, L.L.C."[156] Although Duncan and Seeberger formed a new entity to perform the same type of services rendered by the First OCC, Moses failed to establish that Duncan and Seeberger, through the Second OCC or D and S Casing, usurped any particular business opportunity of the defunct First OCC, serviced any former customer of the First OCC, used any equipment of the First OCC, or used any funds or credit of the First OCC. The value of the name, if any, was not established. Moreover, Duncan and Seeberger were not precluded by statute or agreement from entering into a similar business after the First OCC terminated its operations. Indeed, Duncan and Seeberger did not even begin doing business until six to eight months after the demise of the First OCC, and when the Restraining Order was entered in the Creek County Litigation, they formed D and S Casing so as not to run afoul of any purported rights of Barnes and Moses. The Court finds that Duncan and Seeberger lacked an intent to defraud or harm Moses by doing business as the Second OCC.

In any event, the First OCC owned the property allegedly embezzled or stolen, so, again, the claim could only be asserted by the First OCC, not Moses as an individual. Moses did not establish that Duncan and Seeberger misappropriated or stole any of his personal

---

[155]Id., *quoting* Bryant v. Lynch (In re Lynch), 315 B.R. 173, 179 (Bankr. D. Colo. 2004) (remanded on other grounds).

[156]Second Amended Petition, Plaintiff's Exhibit 74, at 118, ¶ 25.

property or funds.  Accordingly, Moses failed to establish any debt excepted from discharge due to embezzlement or larceny.

### 3.     Breach of general fiduciary duties arising from relationship

The breach of fiduciary duty claims Moses asserted in the Creek County Litigation arose from fiduciary duties of confidence, trust, loyalty and good faith that members of a limited liability company owe to the company (and perhaps to other members).  Such claims are not actionable under § 523(a)(4).[157]   In any event, Moses failed to establish that Duncan and Seeberger breached these general fiduciary duties by failing to disclose and account to Moses for the activities of the Second OCC and D and S Casing, or to share profits with him, primarily because Moses had no equity interest in either of those entities, and therefore Duncan and Seeberger had no duty to disclose or account to him.

### 4.     The Restraining Order

Moses claims that the Restraining Order established a trust in which Duncan and Seeberger were entrusted with the Big Truck and Equipment, and that their failure to preserve the value of the Big Truck and Equipment constituted a defalcation by a fiduciary. The Restraining Order provided that the Big Truck and Equipment "shall be preserved by Defendants, held in trust, not to be transferred, encumbered, damaged, wasted, sold, destroyed or otherwise reduced in value."[158]

---

[157]See Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1372 (10th Cir. 1996).

[158]Restraining Order, Plaintiff's Exhibit 74, at 48, ¶ 6.

The Restraining Order was entered on July 10, 2008; docketed on July 14, 2008; served on Duncan on July 19, 2008; and served on Seeberger on August 5, 2008.[159] Several months prior to the entry of the Restraining Order, Duncan moved the Big Truck and Equipment from his own yard to Doyle Matthews' yard. When Moses first saw the Big Truck in Doyle Matthews' yard, in August 2008, he claims that the Lost Equipment, defined above, was missing. However, it was not established that Duncan or Seeberger had possession or control of the Lost Equipment when the Restraining Order was served upon them or at any time thereafter. Because the Lost Equipment could have disappeared prior to service of the Restraining Order, the Court cannot find that Duncan and Seeberger violated the Restraining Order by failing to protect or account for the Lost Equipment. Moreover, there was no evidence that Duncan and Seeberger used, secreted, damaged, or sold the Lost Equipment, or otherwise withheld the Lost Equipment from Moses or the First OCC.

Nor did Moses present any evidence that Duncan or Seeberger "transferred, encumbered, damaged, dissipated, wasted, sold, [or] destroyed" the Big Truck after the Restraining Order was served upon them. Although Moses claims that Duncan and Seeberger allowed the Big Truck to be "reduce[d] in value," he failed to present any evidence of any reduction in value from the date of the Restraining Order to the date of the ultimate sale of the Big Truck and Equipment. Moses argued that the Big Truck lacked batteries when he took possession of it, but Duncan explained that he had attempted to maintain the batteries by intermittently starting the truck, and that he took them home to charge them, but eventually the batteries would no longer take a charge. Duncan satisfactorily explained the

---

[159]See Plaintiff's Exhibit 74, at 47-48, 63.

absence of batteries, and Duncan and Seeberger did not personally use or otherwise benefit from the batteries.  Moreover, the fact that the First OCC did not recover as much for the Big Truck at auction as anticipated is likely the result of a lack of demand at the time of the sale. Moses did not describe or quantify any deterioration in the condition of the Big Truck that occurred after the entry of the Restraining Order.

Accordingly, to the extent that Moses alleged defalcation based on the trust established by the Restraining Order, the Court concludes that Moses failed to establish any defalcation.

For all the reasons stated above, judgment should be entered in favor of Duncan and Seeberger on Moses's claim under § 523(a)(4).

C.      Section 523(a)(2)(A) Claim

Section 523(a)(2)(A) excepts from discharge debts "for money, property, [or] services, . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud. . . ."[160] Under § 523(a)(2)(A), Moses must prove by a preponderance of the evidence that Duncan and Seeberger made: (1) a false representation of a material fact; (2) with the intent to deceive; (3) upon which Moses actually and justifiably relied; and (4) which caused injury to Moses.[161]

---

[160]11 U.S.C. § 523(a)(2)(A).

[161]Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996), as modified by Field v. Mans, 516 U.S. 59, 75-77 (1995) (creditor's actual reliance must have been justifiable  – a subjective standard that takes into consideration the totality of the circumstances and the knowledge and sophistication of the creditor).  See also Johnson v. Riebesell (In re Riebesell), 586 F.3d 782 (10th Cir. 2009) (articulating the elements of a claim under § 523(a)(2)(A), and explaining the concept of justifiable reliance).

In the Second Amended Petition filed in the Creek County Litigation, Moses alleged that Duncan and Seeberger defrauded him by secretly operating the First OCC (through the Second OCC and D and S Casing), excluding Moses from participating therein, failing to account to him for the profits, and exposing him to liability.[162]  Essentially, Moses alleges a fraudulent nondisclosure of material information.

The Tenth Circuit recognizes that to the extent that a debtor had a duty to disclose certain information, the non-disclosure of that information may constitute a "false representation" or "false pretenses" for purposes of § 523(a)(2)(A).[163]  For the purposes of this analysis only, the Court will assume without deciding that Duncan and Seeberger had a duty, as managers of the First OCC, to disclose their intent to form a new entity in the name of Oklahoma Casing Crews LLC, to enter into an agreement to operate the same as a two-member company, and to purchase new trucks and equipment under the name, and that they failed to do so, which constituted a "false representation."  This discussion will focus on whether Moses established by a preponderance of the evidence the other four elements of § 523(a)(2)(A).

The first issue is whether Duncan and Seeberger failed to disclose their activities with an intent to deceive Moses.  The Court concludes that they did not.  First, Seeberger did not obtain any legal advice before he decided to create a new entity after Barnes determined that the First OCC would no longer operate.  There is no evidence that Seeberger believed that his formation of the Second OCC in any way harmed the First OCC (which was winding up)

---

[162]Second Amended Petition, Plaintiff's Exhibit 74, at 129-30.

[163]See Young, 91 F.3d at 1374-75.

or Moses personally.  Moses had sold the truck and equipment used by the First OCC, and it was improbable, due to the lack of trust, the personality conflicts, and Barnes's fiat, that the four men would ever do business again as the First OCC.  The members of the First OCC did not have an agreement not to compete with the First OCC, or with each other, after the First OCC ceased operating.  Duncan and Seeberger intended to enter into the casing business under the name of Oklahoma Casing Crews LLC in order to earn a living, not to defraud Moses.

Further, Moses did not establish that any debt for "money, property [or] services" was "obtained by" the failure to disclose the existence of the Second OCC to him.  The "obtained by" language of § 523(a)(2)(A) represents the causation element of the fraud claim–that is, the debt (for loss or damage) sought to be excepted from discharge must have been "obtained by," or proximately caused by, justifiable reliance upon the non-disclosure.[164]  If Duncan and Seeberger had been operating the First OCC and using the First OCC's property and funds, and had failed to disclose and account to Moses for any profits derived from such use, Moses may have been entitled to recover damages proximately caused by the non-disclosure, that is, his share of the profits and any other damages for fraud to which he might be entitled under state law.  But Duncan and Seeberger were operating a wholly separate entity with

---

[164]See, e.g., Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1223 (9th Cir. 2010).  See also Hernandez v. Musgrave (In re Musgrave), 2011 WL 312883 at **9-11 (B.A.P. 10th Cir., Feb. 2, 2011) (explaining proximate cause as a "direct link" between the misrepresentation and the debt sought to be excepted from discharge, i.e., the misrepresentation must be a "'substantial factor in determining the course of conduct that results in [the] loss'" and the loss must be "'reasonably . . . expected to result from the reliance'," quoting RESTATEMENT (SECOND) OF TORTS §§ 546 and 548A, respectively, and concluding that the damages claimed by the creditor were not proximately caused by the misrepresentation).

property purchased by that entity, and therefore Moses was not entitled to share in any profits or benefits.  Failing to disclose the formation of the new entity and doing business thereunder did not cause Moses to suffer any direct loss or injury.  Moreover, Duncan and Seeberger did not expose Moses to liability for debts or torts of the Second OCC, as it was clearly distinct from the First OCC in the eyes of the Oklahoma Secretary of State and taxing authorities, and Moses admitted that he has not been held liable for any debts or damages on account of the activities of the Second OCC.  Because Moses was not damaged directly by the non-disclosure of the Second OCC, he cannot establish a debt "obtained by . . . false pretenses, a false representation, or actual fraud."[165]

Moses testified that because the First OCC incurred and paid attorney fees in connection with suing Duncan and Seeberger, he was damaged because those funds would have flowed to him as a creditor of the First OCC (under the lease agreement) had the First OCC not depleted its assets during the course of the litigation.  First, the First OCC's debt to Moses for lease payments did not arise from any action or lack thereof by Duncan and Seeberger.  The First OCC did not pay its lease payments because Barnes and Moses agreed to defer the payments.  Second, after Barnes shut down the First OCC, Barnes and Moses had control of the First OCC's funds and unilaterally decided how the First OCC would spend those funds.   Duncan and Seeberger did not cause the First OCC to pay an attorney rather than Moses's lease claim.  Finally, in any event, the non-payment of the lease obligation by the First OCC is so remotely related to the non-disclosure of the Second OCC that Moses's loss cannot be said to be proximately caused by the non-disclosure.

---

[165]11 U.S.C. § 523(a)(2)(A).

For these reasons, judgment should be entered in favor of Duncan and Seeberger on Moses's § 523(a)(2)(A) claim.

      D.     Section 523(a)(6) Claim

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."[166]  In order to prevail on his § 523(a)(6) claim, Moses must prove that Duncan and/or Seeberger willfully and maliciously caused injury to Moses.  Because "willful" modifies the word "injury," the United States Supreme Court has held that to prevail under § 523(a)(6), the creditor must establish that the debtor acted with a *deliberate intent to inflict injury* on the creditor, or that the debtor believed that the injury was substantially certain to occur as a result of the act.[167]  In addition, the creditor must prove that the debtor acted with malice, that is, "the intent, without justification or excuse, to commit a wrongful act" that the debtor knew or anticipated would injure the creditor.[168]

      *1.     Contempt of Creek County Court Orders*

In his Application for Indirect Contempt Citation filed in the Creek County Litigation, Moses accused Duncan and Seeberger of "knowingly, willfully and maliciously disobeying and violating" the Restraining Order and the Order Allowing Sale of Property (*i.e.*, the

---

[166]11 U.S.C. § 523(a)(6).

[167]See Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).  See also Panalis v. Moore (In re Moore), 357 F.3d 1125, 1129 (10th Cir. 2004); Bucl v. Hampton (In re Hampton), 407 B.R. 443 (Table), 2009 WL 612491 at *5 (B.A.P. 10th Cir. 2009); McCain Foods USA Inc. v. Shore (In re Shore), 317 B.R. 536, 542 (B.A.P. 10th Cir. 2004).

[168]Musgrave, 2011 WL 312883 at *11, *quoting* Black's Law Dictionary.

Unapproved Sale Order).[169]  Under certain circumstances, sanctions for violating court orders

may be non-dischargable under § 523(a)(6).[170]

       The contempt charge was never heard or adjudicated in the Creek County Litigation.

Thus, this Court must first determine if in fact Duncan and/or Seeberger violated those

orders. If violations are found, the Court must determine whether Duncan and Seeberger

committed the violations willfully and maliciously– that is, without just cause or excuse and

knowing or intending that the violations would harm Moses.  Finally, if willful and malicious

conduct is found, the issue becomes whether Moses incurred any damages as a result of the

violations.

       First, Moses alleges that Duncan and Seeberger violated the Restraining Order by

failing to deliver the Big Truck and Equipment to Moses, and that Moses incurred damages

by having to repossess the Big Truck and Equipment himself.  The Restraining Order did not

---

[169]Plaintiff's Exhibit 74, at 291.

[170]For a thoughtful and thorough analysis of how courts in various jurisdictions address dischargeability under § 523(a)(6) of debts imposed as sanctions for contempt, see In re Suarez, 400 B.R. 732 (B.A.P. 9th Cir. 2009), and Liddell v. Peckham (In re Peckham), 442 B.R. 62 (Bankr. D. Mass. 2010).  Generally, in order to for a monetary sanction to be non-dischargeable, the conduct that resulted in the sanction must have been "willful" and "malicious" as those terms are construed for the purpose of § 523(a)(6).  Mere failure to comply with a court order is not sufficient, as a debtor may have some justification or excuse, or the debtor may have been negligent or inattentive, or the debtor may not have intended to harm the creditor.  Some courts require a finding of "some aggravating circumstance evidencing conduct so reprehensible as to warrant denial of the 'fresh start' to which the 'honest but unfortunate' debtor would normally be entitled under the Bankruptcy Code."  Peckham, 442 B.R. at 86-87.

In Peckham, for example, the court found that a sanction for noncompliance with an order to respond to post-judgment discovery was not excepted from discharge because the debtor was depressed, broke, and "buried his head in the sand and presumably hoped that the whole matter would go away," and thus lacked any specific intent to harm the creditor.  Id. at 87.

order Duncan and Seeberger to deliver the property, however.  Rather, it provided them an option to either turn over the property or preserve it until further order of the court.  Their non-delivery of the Big Truck and Equipment did not violate the Restraining Order.

Moses further alleges that Duncan and Seeberger violated the Unapproved Sale Order which required "all property in the possession of [Duncan and Seeberger] or any entities owned in part or controlled by them should be delivered to Plaintiffs within seven days."[171] The Big Truck and Equipment was not then in the possession of either Duncan or Seeberger – it was in Doyle Matthews' yard.  Neither Duncan or Seeberger delivered the property to "Plaintiffs,"[172] but Duncan constructively delivered it when he told Moses to retrieve the property from Doyle Matthews' yard, which Moses did.

Moses claims that he incurred expenses in taking possession of the Big Truck and Equipment and in transporting the property to the auction in Oklahoma City.[173]  Specifically, he claims that he had to buy batteries for the Big Truck and fuel for transportation, and that he spent many uncompensated hours collecting the First OCC's property and liquidating it. Moses unilaterally assumed the role of liquidator of the First OCC's property, however. Because the Big Truck was owned by the First OCC, none of the members had any obligation to expend their personal funds to replace the dead batteries in it or transport it to Oklahoma City.  Thus, Moses should have made a claim against the First OCC and against

---

[171]Plaintiff's Exhibit 74, at 77.

[172]The Unapproved Sale Order was ambiguous as to *where* the property was to be delivered, as it required delivery to "Plaintiffs," which included the First OCC, Moses, and Barnes.

[173]Plaintiff's Exhibit 74, at 293.

the proceeds of the sale of the property to reimburse him for his time and expenses, not a claim against Duncan and Seeberger, individually.  In any event, the Court does not find Duncan's or Seeberger's failure to personally deliver the Big Truck and Equipment to Moses to be willful or malicious.

Moses also contends that Duncan and Seeberger, in violation of the Restraining Order and Unapproved Sale Order, failed to turn over one set of 5½ inch pipe elevators, two sets of 4½ inch pipe elevators, three sets of pipe slips, and miscellaneous tools–*i.e.*, the Lost Equipment.  As stated above, there is no evidence that the Lost Equipment was in Duncan's or Seeberger's possession or control when the Restraining Order was entered or served upon them, or when the Unapproved Sale Order was entered, and therefore the Court cannot find that Duncan or Seeberger willfully or maliciously refused to comply with the orders to preserve or turn over the Lost Equipment.

Moses also contends that by opening new bank accounts, making deposits, and writing checks under the name of Oklahoma Casing Crews LLC and thereafter, D and S Casing, to the Second OCC's creditors, vendors and employees,[174] Duncan and Seeberger violated the Restraining Order's provisions that they "not operate or conduct the business of Oklahoma Casing Crews, L.L.C. without the written unanimous consent of all members"[175] and "cease conducting any business on or behalf [sic] of any Plaintiffs without written unanimous

---

[174]Plaintiff's Exhibit 74, at 297-300, which are entitled "Exhibit 'A' - List of Instances Where Defendant Seeberger Conducted Business of Plaintiff in Violation of Court Orders," "Exhibit 'B' - List of Instances Where Defendant Duncan Conducted Business of Plaintiff in Violation of Court Orders," and "Exhibit 'C' - List of Instances Where Defendants Jointly Conducted Business of Plaintiff in Violation of Court Orders."

[175]Restraining Order, Plaintiff's Exhibit 74, at 292, ¶ 6(1).

consent of all Plaintiffs."[176]   There is no evidence that Duncan and Seeberger conducted business of the four-member Oklahoma Casing Crews LLC, *i.e.*, the First OCC, or conducted business on behalf of Moses or Barnes, after the entry of the Restraining Order.  The First OCC ceased operating at least nine months before the Restraining Order was entered. Duncan and Seeberger did conduct business of the two-member Second OCC—the only one recognized by the Secretary of State at that time– and they had the consent of both members.

Moses also argues the same conduct violated the provision that enjoined Duncan and Seeberger from allowing "any of Plaintiffs' assets or income to be dissipated, wasted, transferred or otherwise converted to personal or other business uses without the unanimous written consent of Plaintiffs."[177]  All the checks listed by Moses as evidence of the violation were written on bank accounts opened by Seeberger and Duncan on behalf of the Second OCC, and later, D and S Casing.  Deposits consisted of revenues of the Second OCC, contributions by Seeberger, and draws on the Second OCC's line of credit, which was guaranteed by Duncan and Seeberger, and secured by Seeberger's parents' certificates of deposit.  Checks were written to the order of the Second OCC's employees, suppliers, and creditors.  Paying the Second OCC's employees, suppliers, and creditors with the deposits made by the Second OCC did not dissipate or use any assets or income of the First OCC, and did not require the consent of Moses or Barnes.

Duncan and Seeberger reasonably and justifiably believed that the Second OCC was sanctioned by the Oklahoma Secretary of State to operate as a new limited liability company,

---

[176]Plaintiff's Exhibit 74, at 292, ¶ 6(3).

[177]Plaintiff's Exhibit 74, at 292, ¶ 6(2).

distinct from the First OCC.  The Second OCC did not use any assets of the First OCC, other than its name, and did not subject the First OCC to any liabilities.  Shortly after the entry of the Restraining Order, Duncan and Seeberger formed a new company, D and S Casing, and entered into a Partnership Agreement to do business under the new name in a good faith attempt to comply with the demand that they cease using the name Oklahoma Casing Crews LLC.

Finding no violation of a court order, and finding no evidence of any intent to harm Moses by using the name Oklahoma Casing Crews LLC,[178] the Court concludes that Moses failed to establish any debt excepted from discharge under 11 U.S.C. § 523(a)(6) on account of alleged violations of court orders.

2.    *Failing to cooperate in winding up and dissolving the First OCC*

Moses argues that Duncan's and Seeberger's lack of cooperation in winding up and dissolving the First OCC and their dilatory litigation tactics[179] were willful and malicious and caused harm to Moses in the form of excessive attorney fees and expenses.

With respect to the Creek County Litigation, the Court concludes that Duncan and Seeberger relied upon Attorney Seeberger to advise them and guide them through the

---

[178]Again, Moses did not establish he suffered any direct injury proximately caused by Duncan and Seeberger's operation of the Second OCC and D and S Casing.  Although he asserts a claim for attorney fees, he did not prevail on his contempt claim, and therefore is not entitled to recover fees expended as damages.

[179]Moses argues that Duncan and Seeberger prolonged the litigation by failing to respond to demands during the litigation; requiring that an accounting be performed by a CPA rather than accepting the accounting drafted by Barnes; requesting data retrieval from the company computer and then not using it for anything; failing to comply with discovery requests and orders; and failing to timely respond to motions or attend hearings, and later seeking relief from the orders granting the motions.

litigation.  The Court finds no evidence that Duncan or Seeberger had any desire or intention to unreasonably delay the dissolution of the First OCC or to prolong the litigation.  That they declined to simply acquiesce in appointing Barnes, Moses, and their chosen lawyer, Ms. Cinocca, to wind up and dissolve the entity was understandable considering (1) their reasonable suspicion of Barnes's management of the First OCC's finances and desire for an audit thereof; (2) their lack of sophistication and legitimate reliance on the advice of their accountant, Mr. Osborn, and Attorney Seeberger; and (3) the unwarranted claim by Moses and Barnes to an interest in the Second OCC and D and S Casing.

At the trial before this Court, Ms. Cinocca testified that the resolution of the parties' rights in the First OCC was prolonged by a delay in obtaining information and documents from Duncan and Seeberger.  However, no formal discovery requests were propounded until June 2009, a full year after commencement of the Creek County Litigation.  In July 2009, when Duncan and Seeberger testified in their depositions that they had formed and operated the Second OCC and D and S Casing, it was Ms. Cinocca who escalated the litigation, asserting that Duncan and Seeberger's new venture was an extension of the First OCC, and that Duncan and Seeberger's business activities constituted tortious behavior, which this Court has determined was not warranted by the facts or law.

In any event, the fact that the First OCC ultimately distributed all its assets to Ms. Cinocca in payment for legal services and expenses, resulting in no distribution to the members, cannot be attributed solely to any acts or omissions by Duncan and Seeberger.[180]

---

[180]All proceeds of the sale of the Big Truck and Equipment and the Second OCC's truck and equipment, as well as collections on outstanding accounts of the First OCC were paid to Ms. Cinocca.  After all assets of the First OCC were liquidated, there was nothing left

The Creek County Litigation presented a typical business dispute where members were deadlocked.  Neither faction acted with the utmost candor, prudence, or restraint, but neither faction acted with willful and malicious intent to injure the other either.[181]

### 3. Voting against selling the Big Truck and Equipment in 2007

Moses contends that Duncan and Seeberger willfully and maliciously injured him by refusing to consent to the sale of the Big Truck and Equipment to Dan Darling in October 2007.  Apparently, the argument is that the proceeds of such a sale (allegedly in excess of $100,000) would have been available to pay the First OCC's obligation to Moses on the lease, and therefore Moses was damaged as a result of the non-consent.

Duncan and Seeberger had no legal or moral obligation to vote in favor of selling the Big Truck and Equipment.  Nor did Duncan or Seeberger recall even knowing the amount of Dan Darling's offer.  Moreover, there was no evidence that they had been given any advance notice that the disposition of the Big Truck and Equipment was to be decided on that day.

The Court finds that it is not unreasonable for a member of a limited liability company to expect to be allowed some time to determine whether an offer for all the company's operating assets is fair, whether other offers might be forthcoming, or whether the company might in fact be salvaged and continue operating, in which event it is not unreasonable to decline to sell the equipment to a competitor.  The Court further finds the evidence

---

to divide among the members.

[181]In fact, if anything, it was overzealous and underzealous lawyering that caused the litigation to be more expensive than warranted by the nature of the dispute.

insufficient to support any inference that Duncan and Seeberger blocked the sale of the Big Truck and Equipment in order to appropriate it to their own use to the exclusion of the other two members of the First OCC.  In fact, Duncan and Seeberger did not use the Big Truck and Equipment; rather, they capitalized the Second OCC, which acquired its own truck and equipment.

Although the First OCC realized considerably less from the auction of the Big Truck and Equipment in 2009 than it would have if transaction proposed by Dan Darling in 2007 had been approved, there is no evidence that Duncan and Seeberger intended this result or intended specifically to injure Moses.  Because all four members had equal interests in the First OCC, the decline in the value of the Big Truck and Equipment affected each of them equally.

Accordingly, the Court concludes that Moses failed to establish any debt arising from a willful and malicious injury to him or his property, and therefore judgment should be entered in favor of Duncan and Seeberger on Moses's § 523(a)(6) claim.

## IV.   Conclusion

For the reasons stated herein, the Court finds and concludes that Moses has failed to establish a debt excepted from discharge under § 523(a)(2)(A), (a)(4), or (a)(6). A separate judgment will be entered contemporaneously herewith.


DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE



